IN THE CIRCUIT COURT OF BEADLE COUNTY, SOUTH DAKOTA
THIRD JUDICIAL CIRCUIT

| | |
|---|---|
| TRIPLE K FARMS AND JOHN SCHNEIDER, *on behalf of themselves and all others similarly situated,* ) ) ) ) | |
| Plaintiffs, ) ) | CASE NO:_____ |
| v. ) ) | |
| SYNGENTA AG, SYNGENTA CROP PROTECTION AG, SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC, AND SYNGENTA SEEDS, INC, ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. ) | |

## CLASS ACTION COMPLAINT

Plaintiffs Triple K Farms and John Schneider bring this action individually and on behalf of all others similarly situated against Syngenta AG ("Syngenta AG"), Syngenta Crop Protection AG ("Crop Protection AG"), Syngenta Corporation ("Syngenta Corp"), Syngenta Crop Protection, LLC ("Crop Protection LLC"), and Syngenta Seeds, LLC ("Syngenta Seeds") (Syngenta AG, Crop Protection AG, Syngenta Corp, Crop Protection LLC, and Syngenta Seeds are sometimes hereinafter collectively referred to as either "Defendants" or "Syngenta") and state as follows:

## NATURE OF THE ACTION

Biotechnology holds promise to potentially improve the lives of many. But it also can cause extraordinary harm if handled irresponsibly.

Part of acting responsibly requires that biotechnology companies avoid introducing a new genetic trait into the market prematurely before it has been approved in all significant export markets. All in the industry, including Syngenta, recognize that premature commercialization can

3668354.1

**Exhibit A**

cause significant trade disruptions and enormous harm to farmers and other industry participants. That is why they have pledged to each other and to other stakeholders, including corn farmers, that they will act responsibly in introducing new bio-engineered genetic traits into the market.

Syngenta had the opportunity to act responsibly in 2010. Its new genetically modified corn Agrisure Viptera®, containing the MIR162 genetic trait, had just been deregulated by the United States Department of Agriculture ("USDA"). But Syngenta was aware that a large and growing export market for U.S. corn farmers, China, had not approved MIR162. In fact, Syngenta had only that same year sought regulatory approval in China, and at the time, the average time for regulatory approval in China was 2-3 years. The process is longer if applications are incomplete or incorrect. And Syngenta's were. Syngenta had been previously warned by industry participants not to introduce another MIR genetic trait because of lack of approval in export markets, and the devastating consequences that could occur from such premature commercialization.

But Syngenta also knew that the clock was ticking on expiration of its patent for this genetic trait. Every year that passed without commercialization meant lost monopoly profits granted by patent.

Syngenta had a decision to make. It could wait until China approved its new genetic trait and temporarily forego its monopoly profits. That is what it had pledged to do, and what responsible practice in any event dictated. Or, Syngenta could immediately commercialize Agrisure Viptera®, and create an enormous risk that U.S. corn farmers would lose one of their large and growing export markets.

Sadly, Syngenta opted for its monopoly profits over responsibility to its stakeholders. It chose to commercialize Viptera® for the 2011 crop year knowing that China would not approve MIR162 until sometime *after* that trait had entered export channels.

2

3668354.1

**Exhibit A**

During 2011 - 2013, Syngenta was called upon again by industry participants to show responsibility and stop its overly aggressive commercialization. China's importance as a purchaser of U.S. corn had continued to grow and it still had not approved MIR162. Syngenta's response was to *expand* sales for the 2012 and 2013 growing seasons, and capture more monopoly profits.

In November 2013, the very occurrence that had been foreseen by industry participants, including Syngenta, occurred. U.S. exports to China were found to be contaminated with MIR162, which still had not been approved by China. China therefore began rejecting shipments of corn from the U.S.

After rejection of U.S. corn shipments, industry participants in early 2014 demanded that Syngenta immediately halt commercialization of Agrisure Viptera®. They also demanded that Syngenta not commercialize a brand new product, Agrisure Duracade™, which also contained MIR162 and a new event, not approved by China and other export markets – Event 5307. The industry participants pointed out that they were "gravely concerned about the serious economic harm" to those in the industry, including farmers, caused by the loss of the Chinese market. At that time, the National Grain and Feed Association quantified the economic harm as already ranging from $1 billion to $2.9 billion.

Syngenta doubled down. It continued to sell Agrisure Viptera®, and launched Agrisure Duracade™ for the 2014 crop year, thereby prolonging the economic harm indefinitely. Those irresponsible actions also ensured that the economic losses to farmers and others in the industry would continue to grow.

These events show corporate greed at its worst. But there is more. To attempt to minimize the perceived impact of its conduct, Syngenta actively misled farmers, industry participants and others about the importance of the Chinese market, the timing and substance of its application for

3

**Exhibit A**

approval in China, the timing of when China was likely to approve MIR162, its ability to "channel" Viptera® to non-Chinese markets and otherwise contain the infiltration of Viptera® into the U.S. corn supply and other issues described below. In fact, even though it represented to the USDA and the public that "there should be no effects on the U.S. maize export market" from deregulation and that it would impose stewardship and channeling requirements to steer Viptera® corn away from export markets that had not approved it, Syngenta did not follow through in any meaningful way on this commitment. Just the opposite. When one company – Bunge North America, Inc. ("Bunge") – tried to minimize the risk that Viptera® would be found in shipments to China by refusing to accept it, Syngenta sued Bunge in an effort to force it to accept Viptera®. Syngenta was far more concerned about the impact on its business than it was about the loss of an important export market for corn farmers.

Under the basic laws of supply and demand, when there is less demand for a product, the price is lower than it otherwise would be. China was a large and growing export market, and was predicted by the USDA to be the largest export market for corn by 2020. The loss of that market has caused enormous economic harm to U.S. corn farmers, and that harm is continuing to grow. While China finally approved MIR162 in December 2014, it has not approved Event 5307. U.S. corn exports to China have not yet begun to recover, and it remains to be seen whether they will ever regain the levels they would have attained but for the embargo.

Through this complaint, U.S. corn farmers seek compensation for losses they have suffered as a result of Syngenta's irresponsible conduct, and punitive damages for Syngenta's reprehensible and outrageous behavior.

4

**Exhibit A**

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this case. Plaintiffs are asserting claims under South Dakota Law that this Court has authority to adjudicate under S.D.C.L. § 16-6-9. Defendants are subject to personal jurisdiction in South Dakota because Defendants have marketed, sold, or otherwise disseminated, and continue to market, sell, or otherwise disseminate, Viptera® and Duracade™ corn in the State.

2.      Venue is proper in because Triple K Farms is a resident of Beadle County, South Dakota. Further, Triple K Farms suffered injury in Beadle County, South Dakota. Defendants are non-resident corporations.

## PARTIES

*Plaintiffs*

3.      Triple K Farms is a citizen of South Dakota and farms in Beadle County, South Dakota.  Triple K Farms is a partnership whose members, Kenny Kleinsasser, Kevin Kleinsasser, and Ken Kleinsasser, are South Dakota citizens. Triple K Farms planted approximately 1,300 acres of corn in 2014.

4.      John Schneider is a citizen of South Dakota and farms in Edmunds County, South Dakota. John Schneider planted approximately 600 acres of corn in 2013 and 700 acres of corn in 2014.

*Defendants*

5.      Syngenta AG is a corporation organized and existing under the laws of Switzerland with its principal place of business at Schwarzwaldallee 215, 4058 Basel-Stadt, Switzerland. Syngenta AG is a publicly traded company on the Swiss stock exchange.  American Depositary Receipts for Syngenta AG are traded on the New York Stock Exchange.  Syngenta AG

3668354.1

**Exhibit A**

was formed in 2000 as a result of the merger of Novartis Agribusiness and Zeneca Agrochemicals and is the only publicly traded company among the various Syngenta entities named as defendants in this case. Service of process on Syngenta AG will be made in accordance with applicable law.

6.      Crop Protection AG is a corporation organized and existing under the laws of Switzerland with its principal place of business at Schwarzwaldallee 215, 4058 Basel-Stadt, Switzerland. Service of process on Crop Protection AG will be made in accordance with applicable law.

7.      Syngenta Corp. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 3411 Silverside Road # 100, Wilmington, Delaware 19810-4812. Syngenta Corp is a subsidiary of Syngenta AG. Syngenta Corp. will be served with process in accordance with applicable law.

8.      Crop Protection, LLC, is a limited liability company organized and operating under the laws of the State of Delaware with its principal place of business at 410 South Swing Road, Greensboro, North Carolina 27409-2012. Crop Protection, LLC, is a subsidiary of Syngenta Seeds. Crop Protection, LLC will be served with process in accordance with applicable law.

9.      Syngenta Seeds, formerly a Delaware corporation with a principal place of business at 11055 Wayzata Boulevard, Minnetonka, Minnesota 55305-1526, is now a Delaware limited liability company with Syngenta Corp. as its sole member. Syngenta Seeds is a direct subsidiary of Syngenta Corp. Syngenta Seeds will be served in accordance with applicable law. Syngenta Seeds has described itself in its Complaint filed in *Syngenta Seeds, Inc. v. Bunge North America, Inc.*, No. 5:11-cv-04074-MWB, United States District Court, Northern District of Iowa ("*Bunge*" or "*Syngenta v. Bunge*"), as

> a leading agribusiness company committed to sustainable
> agriculture through research and technology. Syngenta is, among

6

**Exhibit A**

other things, in the commercial seed business. It develops, produces, and sells, through dealers and distributors or directly to growers, a wide range of agricultural products, including corn and soybean seed exhibiting useful traits that have been developed with the techniques of modern biotechnology. The seed products are then grown and harvested as raw materials for the production of biofuels or grain for livestock feed; or are milled and processed for food products.

Among Syngenta Seeds' products which it has sold in the State of South Dakota and elsewhere are the Agrisure Viptera® and Agrisure Duracade™ corn seeds. These seeds express, or contain, genetically engineered traits which confer resistance to insects.

10.    Syngenta AG wholly owns, directly or indirectly, each of Crop Protection AG, Syngenta Corp., Crop Protection LLC, and Syngenta Seeds.

11.    Syngenta AG represents itself as a global company. According to Syngenta's own website, Syngenta AG's Board of Directors "has full and effective control of the company and holds ultimate responsibility for the company strategy."

12.    One or more members of Syngenta AG's Board of Directors or the Executive Committee established by the Board of Directors also serve as member(s) of the Board of Directors of Crop Protection AG, Syngenta Corp., Crop Protection LLC, and/or Syngenta Seeds.

13.    Furthermore, Syngenta AG's Executive Committee formulates and coordinates the global strategy for Syngenta businesses, and maintains central corporate policies requiring Syngenta subsidiaries, including those named as Defendants herein, under the general guidance of the Syngenta group control.

14.    Employees of the Syngenta group as a whole maintain reporting relationships that are not defined by legal, corporate relationships, but in fact cross those corporate lines. For example, Crop Protection AG maintains two separate product lines – Seeds and Crop Protection – that cross the Defendants' separate legal, corporate existences.

7

3668354.1

**Exhibit A**

15.     The Defendant subsidiaries are subject to additional oversight that requires them to seek approval for certain decisions from higher levels within the functional reporting structure – including in some instances Syngenta AG. Appointments of senior management personnel for the Defendant subsidiaries also may require, in certain instances, approval from individuals or governing bodies that are higher than each subsidiary's respective board of directors.

16.     Moreover, Syngenta AG and Syngenta Crop Protection AG management were intimately involved in, and in some instances directed, decisions concerning the commercialization of Viptera® without Chinese approval.

17.     Also, Syngenta AG maintains a central global finance function that governs all Defendants. Thus, the Defendant subsidiaries do not function independently but under the Syngenta AG umbrella.

18.     In addition, Defendants regularly refer to themselves as "Syngenta," with no further description.

19.     Thus, the respective jurisdictional contacts of Crop Protection AG, Syngenta Corp., Crop Protection LLC, and Syngenta Seeds in South Dakota are attributable to Syngenta AG because of the unusually high degree of control Syngenta AG exercises over these subsidiaries. *See, e.g., City of Greenville v. Syngenta Crop Protection, Inc. et al.*, 830 F. Supp. 2d 550 (S.D. Ill. 2011).

20.     In addition, upon information and belief, the Defendants acted in concert pursuant to agreements or other arrangements to act in a collective manner and/or as joint venturers regarding the actions and events made the subject of this Class Action Complaint. All Defendants are therefore jointly and severally liable for the acts for which Plaintiffs makes complaint.

3668354.1

**Exhibit A**

## FACTUAL ALLEGATIONS

21.     Biotechnology firms such as Syngenta develop and obtain patents on their bio-engineered products.  A patent gives the biotechnology firm the exclusive right to sell its bio-engineered products; however, those patents eventually expire.  Biotechnology firms have an economic incentive to "commercialize" (*i.e.* bring their products to market for planting and harvest) as soon as possible after filing a patent application in order to maximize profitability.

22.     According to Grant Ozipko, the goal set by senior leadership (including Charles Lee, David Morgan, Steve Ligen and/or Diane Mayhart), was to achieve 9.5% market share for MIR162 by 2014.  *See* Grant Ozipko Deposition (10/19/12) (*Bunge*) at 72-73.  Syngenta was concerned with "commercialization as soon as possible." *See* MIR162H-I Stage gate progression review dated December 16, 2009.

23.     But premature commercialization poses a well-known and significant risk of harm to farmers if bio-engineered commodity products are commercialized before they are approved by major importing nations.  Certain importing nations, such as China, have a "zero tolerance" policy and will reject grain imports from the U.S. upon detecting the presence of even trace amounts of an unapproved bio-engineered genetic trait in U.S. grain shipments.  This was well known by participants in the biotechnology industry, including Syngenta, before, but at least by, 2007.

24.     Syngenta commercialized MIR162 – and Event 5307 – despite clear risk of harm to its stakeholders, including Plaintiffs and the Classes in this action, Syngenta's knowledge of that risk, and Syngenta's own professed commitment to responsible management.

25.     Moreover, Syngenta commercialized MIR162 by consistently misrepresenting the importance and status of China's approval and without adequate systems in place to isolate or

**Exhibit A**

channel MIR162, virtually assuring that MIR162 would contaminate the U.S. corn supply, as set out below.

***Recognized Risk Of Irresponsible Commercialization***

26.     As recognized within the industry, and by Syngenta, the harm threatened by irresponsible commercialization is very real.

27.     "There have been a number of high-profile cases involving genetically modified varieties . . . and disruption of international shipments of commodity grains such as corn, wheat, and rice." http://www.syngentafoundation.org/index.cfm?pageID=703.

28.     For example, bio-engineered corn contaminated the U.S. corn supply in 2000 and disrupted international trade, causing loss to farmers and other industry participants. *In re StarLink Corn Products Liability Litigation*, 212 F. Supp. 2d 828 (N.D. Ill. 2002).

29.     In 2006, bio-engineered rice contaminated the U.S. rice supply, again disrupting trade and causing massive damages to U.S. rice farmers and other industry participants. *See, e.g., In re Genetically Modified Rice Litig.*, 666 F. Supp. 2d 1004 (E.D. Mo. 2009); *Bayer CropScience LP v. Schafer,* 2011 Ark. 518, 385 S.W.3d 822, 832 (Ark. 2011).

30.     In addition to being aware of these and other well-publicized incidents at the time it commercialized MIR162, Syngenta had (and has been) continuously warned by stakeholders about the importance of, and need for, responsible commercialization.

31.     For example, when Syngenta commercialized MIR604 (Agrisure® RW) in 2007, the National Grain and Feed Association ("NGFA") (of which Syngenta is a member) and the North American Export Grain Association ("NAEGA") warned against an "'ill-conceived' plan to commercialize" Syngenta's Agrisure biotechnology-enhanced corn as endangering U.S. corn and corn-product exports since it had not obtained regulatory approval for food and feed use in Japan

10

**Exhibit A**

and other U.S. export markets.  Houin, "Feed and grain organizations warn growers of limited export markets," Farm World (4/25/2007).

32.     The International Grain Trade Coalition also chastised Syngenta, stating that Syngenta "did not respect the responsibility of importing governments to perform necessary risk assessments as demanded by their legislation," that the introduction of Agrisure® RW "was not done in an open transparent manner," and that Syngenta "did not complete authorization in major international markets possessing scientifically sound approval systems prior to commercialization."  Letter from International Grain Trade Coalition to Michael Pragnell, CEO Syngenta dated April 18, 2007 at 2.  The International Grain Trade Coalition further stated that Syngenta's conduct "[e]xposed downstream members of the value chain including producers, handlers, exporters, importers, food processors and distributors to significant liability as currently all countries employ a zero threshold policy for an event not authorized by the importing country" and strongly urged Syngenta to "reverse immediately its decision to commercialize Agrisure RW at this time."  *Id.*

33.     The Biotechnology Industry Organization ("BIO") is the world's largest biotechnology trade association, of which, on information and belief, Syngenta is or was a member.  BIO has expressly recognized that "[a]synchronous authorizations combined with importing countries maintaining 'zero tolerance' for recombinant-DNA products not yet authorized results in the potential for major trade disruptions."  BIO Product Launch Stewardship Policy, May 21, 2007, at Annex 1 Introduction; *see also* BIO Product Launch Stewardship," December 10, 2009, at Annex 1 Introduction (same); BIO "Stewardship: Actions to be Taken Prior to Launching Special Traits," October 4, 2010, at Annex 1 Introduction (same); BIO Product

11

Launch Stewardship: Food and Agriculture Section, November 27, 2012, at Annex 1 Introduction

(same).

34.    As stated in BIO's "Product Stewardship Policy" dated December 10, 2009:

> Since the commercial introduction of biotechnology-derived plant
> products in 1996, an increasing number of biotechnology-derived
> plant products intended for food or feed use are authorized for
> commercial production in many countries throughout the world;
> however, authorizations in importing countries vary depending on
> the timing of submissions for import authorization as well as the
> duration of the authorization process in each country. As a
> consequence of these asynchronous authorizations, low levels of
> recombinant-DNA plant materials that have completed full safety
> assessments in accordance with national and international standards
> in one or more countries may, on occasion, be present in food or
> feed in countries in which the authorization process of the relevant
> recombinant-DNA plant material has not been completed.
> Asynchronous authorizations combined with importing countries
> maintaining 'zero tolerance' for recombinant-DNA products not yet
> authorized results in the potential for major trade disruptions.

http://www.bio.org/sites/default/files/Product_Launch_Stewarship_12_10_09.pdf.

**Recognized Stewardship Obligation**

35.    The risk in premature commercialization is well-recognized within the industry and

as a result, biotechnology organizations, including CropLife International (of which Syngenta is a

member) and BIO, have developed stewardship standards under which bio-technology firms

refrain from commercializing their products before those products are approved by importing

nations.

36.    The very genesis of BIO's product launch policy in 2007 was Syngenta's own

launch of MIR604 without Japanese import approval. *See* John Bernens Deposition (11/2/12)

(*Syngenta Seeds, Inc. v. Bunge North America, Inc.*, No. 5:11-cv-04074-MWB (N.D. Iowa Aug.

22, 2011)) at 110-113; *see also* Email from Sarah Hull to Jane Bachmann and Anne Burt dated

February 19, 2008 ("While I know we will be ready to sell MIR162 in the US in 2009, it seems

3668354.1

**Exhibit A**

we won't have the stacks approved in Japan to fully launch the product without managing some of the trade implications. This is where grain traders were so upset with the [Agrisure] RW launch. We commercialized without having Japan approval prior to planting. That in turn spawned the BIO policy.").

37.     Syngenta has, since at least 2007, represented that it is "committed to the principles of good stewardship, which are exemplified through the responsible management of [its] products across their lifecycle [including] commercialization" and its support for BIO's Product Launch Stewardship policies. *See* Bio Product Launch Policy, Syngenta Implementation Principles (Nov. 2007) (http://www.syngentabiotech.com/biopolicy.aspx). On information and belief, Syngenta's Jeff Cox has expressly indicated Syngenta's support for this policy and pledged that "we will implement it with Syngenta."

38.     Under the BIO stewardship policy, developers like Syngenta should meet applicable regulatory requirements in key markets prior to commercialization. *See* BIO Product Launch Stewardship, December 10, 2009, at 4.

39.     Under the BIO policy, developers also should:

> Conduct a market and trade assessment to identify key import markets, including those with functioning regulatory systems, prior to the commercialization of any new biotechnology product (crop by event) in any country of commercial launch. In that market and trade assessment, consult at an early stage with the value chain for the specific crop. **Manage the product's introductions so that choice of production methods (coexistence) and markets (e.g., specialty, identity preservation, and global) for that crop are available and preserved.** *Id.* (emphasis added).

40.     Under the BIO policy in 2009, key markets included "*at minimum*," the United States, Canada, and Japan. *Id.* (emphasis added).

13

**Exhibit A**

41.    For purposes of the BIO policy, "commercialization" means the first planting of seed for the production of a crop or crop product. *See* BIO Product Launch Stewardship, December 10, 2009, at 4 n.4. *See also* Email from Sarah Hull to Jane Bachmann and Anne Burt dated February 19, 2008 (commercialization is defined in BIO policy as the first planting of seed sold into commerce for the production of a crop).

42.    BIO policies are minimum standards of responsible behavior. BIO expressly states that its policy "does not limit the implementation of additional measures designed to facilitate adoption and use of [commodity crop] products and to prevent disruption of . . . the trading of the commodity." BIO Product Launch Stewardship, December 10, 2009, at 4.

43.    Another biotechnology industry association, Excellence Through Stewardship, advocates similar standards through its "Product Launch Stewardship Guide." http://excellencethroughstewardship.org/wp-content/uploads/Approved-Product-Launch-Stewardship-Guide-Revised-07-22-10.pdf.   Syngenta is a "founding member" of this program. www.syngentabiotech.com/biostewardship.aspx.

44.    Biotechnology industry groups are not alone in recognizing the importance of stewardship. The National Grain and Feed Association's Policy on Agriculture Biotechnology provides:

> The NGFA supports agricultural biotechnology and other scientific advancements that promote safe and abundant food and feed supply. However, the NGFA believes **biotech-enhanced traits should be commercialized only after achieving broad, deep consumer acceptance, as well as authorizations from U.S. export markets, to enable the industry to meet customer preferences and maintain access to global markets**. The NGFA advocates prudent policies to guard against the presence of unauthorized or restricted-use biotech-enhanced traits in the general commodity stream.

http://www.ngfa.org/news-policy-center/positions-priorities/ (emphasis added).

14

3668354.1

**Exhibit A**

45.   The North American Export Grain Association agrees:

Biotechnology providers should be required to accept liability to compensate parties for economic damage resulting from a failure to adequately implement and enforce binding risk-management (stewardship) and supply chain management plans deemed sufficient and effective in preventing biotech events from becoming present in the general commodity stream at levels that could disrupt efficient commerce.

One of the most important of these commitments is to voluntarily restrict commercialization (marketing of seeds) under corporate stewardship plans until such time as the technology provider has obtained sufficient import authorizations from foreign governments. It is imperative that such import authorizations be in place to provide U.S. grains and oilseeds with competitive, reliable and efficient access to international markets.

The reality is that bulk grain and oilseed shipments 'may contain' a biotech-enhanced event that has been made available to producers for commercial production. Any biotechnology trait present in such shipments that lacks approval in a country of import will confront an impossible-to-achieve zero tolerance in that country. The consequences of such occurrences are dire, including impeding the ability of importing countries to provide for food security, imperiling present and future market opportunities for U.S. farmers, and unrecoverable and extensive product and shipment-rejection costs to the U.S. production and grain marketing system.

These international authorizations need to be in place at the time seed containing the event first is purchased by producers. U.S. corn producers often make their initial seed purchase decisions in the fall prior to spring planting – about the same time as international buyers begin substantial contracting for delivery of the next year's harvest. Given that such contracts are contingent upon receiving authorizations for all biotech-enhanced events that may be present in the commodity shipment, NAEGA and NGFA believe import authorizations need to be in place at least one year prior to harvest-time deliveries from U.S. farms.

However, we recognize that technology providers may find the opportunity for economic reward attractive enough to avoid completing U.S. export market approvals prior to product launch in the United States. In such cases, appropriate restraints and responsibility for risks imposed on downstream stakeholders when and after a crop biotechnology event is in production must be part

15

**Exhibit A**

of all technology providers' product stewardship commitments. Such restraint and risk responsibility is critically important when crop biotechnology is deployed under regulatory systems like the science-based U.S. coordinated regulatory framework, which does not apply an international merchantability or marketability test prior to commercialization of the genetically engineered event. Under no circumstances can or should the grain handling, processing or export industry sectors in the United States or abroad be expected to shoulder the financial risks associated with market disruptions that they have little, if any, ability to control or manage. Rather, the technology providers that do have the ability to control such exposure – and reap the economic reward of commercialization prior to authorization of their products in international markets – must be held responsible. Doing otherwise creates market risk, and undermines the ability of U.S. agriculture to contribute to global food security, as well as to U.S. economic growth and job creation.

http://naega.org/wp-content/uploads/2012/05/NGFA-NAEGA-Joint-Statement-on-Pioneer-

Petition-for-APHIS-Deregulation-of-Pioneer-Hi-Bred-International-Biotech-Maize-.pdf.

46.     The Syngenta Foundation For Sustainable Agriculture states that "until a country issues a registration approval for cultivation and/or food and/or feed consumption, there is a clear responsibility and liability, even if the government scientific assessments show that there are no safety or environmental concerns," and recognizes that stewardship, among other things, "works to prevent trade disruptions." http://www.syngentafoundation.org/index.cfm?pageID=703.

*Syngenta Recognizes Its Stewardship Obligation*

47.     Under the "Corporate Responsibility" section of its website, Syngenta acknowledges the integrated nature of the commodity market, and its responsibility to "stakeholders" affected by its business, which include farmers:

> Our stakeholders are the people who can affect our business or who are affected by it. They include the following groups:
>
> Growers
> Industry
> Non-governmental organizations and international agencies
> Investors

16

3668354.1

**Exhibit A**

Employees
Government

48.     Syngenta has committed to "respond to feedback from its stakeholders" and "to implement high standards of stewardship for the safe, effective and environmentally responsible use of its products."   http://www.syngenta.com/global/corporate/en/about-syngenta/corporate-responsibility/Pages/cr-policy-and-commitments.aspx.

49.     Syngenta represents that "it prioritize[s] the issues that are most relevant to     our business and most important to our stakeholders."

50.     Syngenta also represents that it "maintain[s] the highest standards across our entire business and go[es] beyond regulatory compliance."

51.     In Syngenta's "Code of Conduct," posted on its website for farmers to read, Syngenta represents:

- "The trust and confidence of Syngenta's stakeholders is critical to our continuing success and will only be sustained if the company acts and is seen to act in accordance with the highest standards of ethics and integrity. To ensure we meet the standards which our stakeholders expect, we have produced this new Syngenta Code of Conduct . . . ."

- "We provide innovative, reliable, high-quality products **and have safeguards to protect stakeholders**."

- "The creativity of our people provides products which help growers meet the global challenges to agriculture."

- **"We will work closely with customers, contractors, users and all other stakeholders to ensure proper and responsible use of our products and understanding of the precautions that apply . . . ."**

17

**Exhibit A**

(emphasis added).

52.    In November 2007, Syngenta adopted its own "Bio Product Launch Policy." The Syngenta Bio Product Launch Policy incorporates BIO's Product Launch Policy, and required Syngenta to perform a market and trade assessment to identify key importing nations and obtain those nations' approval prior to commercializing a new bio-engineered product. http://www.syngentabiotech.com/biopolicy.aspx.

53.    On its website, Syngenta also suggests that it complies with the stewardship standards adopted by CropLife International and Excellence Through Stewardship, advising farmers that they may learn more about "stewardship" by visiting the provided links. *See* http://www.syngentabiotech.com/BioStewardshipLinks.aspx.

54.    It is clear that the importance of obtaining import approval from key markets was well known and recognized within the biotechnology industry and by Syngenta before Syngenta commercialized MIR162, under the Agrisure Viptera® brand name and trademark, for the 2011 crop year.

55.    And Syngenta had committed to not commercializing new genetically modified traits that had not been approved by key import markets. *See, e.g.,* BIO Product Launch Policy, Syngenta Implementation Principles (Nov. 2007). Even if it had not, Syngenta clearly knew the risks of premature commercialization, and knew that without stringent containment and channeling procedures, MIR162 would contaminate the U.S. corn supply and move to export markets, causing significant trade disruption as set out below. Based on clear warnings and its own knowledge, Syngenta knew or plainly should have known that China was a key and growing market. Responsible practice dictated that Syngenta not commercialize Agrisure Viptera®, and certainly

18

3668354.1.

**Exhibit A**

not do so without adequate containment and effective channeling measures in place, prior to obtaining import approval. Syngenta, however, did just the reverse.

**Regulation, Testing And Deregulation Of MIR162**

56. The process of commercialization begins with obtaining approvals from U.S. agencies, including (but not limited to) deregulation from the Animal, Plant and Health Inspection Service ("APHIS") of the USDA.

57. The regulations in 7 C.F.R. part 340 (the "GMO Regulations") regulate, among other things, the introduction (importation, interstate movement, or release into the environment) of organisms and products altered or produced through genetic engineering that are plant pests or that there is reason to believe may be plant pests. Such genetically engineered organisms and products are considered "regulated articles." The GMO Regulations were promulgated under the Plant Protection Act (the "PPA"), 7 U.S.C. § 7701, *et seq.*, or its predecessor statutes.

58. MIR162 is a genetically modified trait which, prior to its deregulation, was regulated by the USDA under the PPA and GMO Regulations.

59. The GMO Regulations at 7 C.F.R. §§340.3 and 340.4 allow release into the environment of regulated, genetically modified traits, such as MIR162, prior to their deregulation, through field trials conducted under permits issued by, or notifications to, APHIS. Developers who field test genetically modified traits, such as Syngenta in its field testing of MIR162, are required to adhere to certain performance standards set forth in the GMO Regulations to ensure that the regulated genetically modified organism does not persist in the environment or enter the food or feed supply. Similarly, at the end of all field tests, developers must destroy or properly contain any viable plant material in the field and ensure that no regulated material persists in the environment beyond the duration of the trial.

19

**Exhibit A**

60.     Syngenta is no stranger to release of regulated GM events. In 2005, Syngenta entered into a settlement with the USDA ($375,000 fine plus a required training program) stemming from its release of still-regulated Bt10 corn, which Syngenta supplied as deregulated Bt11 corn between 2001 and 2004. About 14,000 bags of Bt10 seeds, or enough to plant 37,000 acres, were sold from 2001 to 2004, mainly to farmers in the U.S. but also in Canada and Argentina. The Bt10 event was found in at least five Bt corn breeding lines in the U.S. and it was estimated that the seeds could have been planted on 37,000 acres in the U.S., producing "an estimated 150,000 tons of corn from this area" and accounting for approximately .01% of the total U.S. corn acreage. *See* New York Times, "U.S. Fines Swiss Company Over Sale of Altered Seed" (April 9, 2005); PR Newswire, "Syngenta Agrees to Settlement With USDA on Unintended Bt10 Corn" (http://www.prnewswire.com/news-releases/syngenta-agrees-to-settlement-with-usda-on-unintended-bt10-corn-54220787.html). Syngenta later paid a $1.5M fine to the EPA, which conducted an investigation confirming the distribution of unregistered Bt10 corn on "over 1000 occasions." EPA News Release "EPA Fines Syngenta $1.5 Million for Distributing Unregistered Genetically Engineered Pesticide" (Dec. 21, 2006).

61.     Between 1999 and 2007, Syngenta conducted at least 119 field trials of MIR162 corn under at least 20 permits issued by, or notifications to, APHIS under the GMO Regulations at sites in 31 states, including multiple field tests in each of the ten (10) states with the largest corn production.

62.     The GMO Regulations in 7 C.F.R. §340.6(a) provide that any person may submit a petition to APHIS seeking a determination that an article should not be regulated under 7 C.F.R. part 340.

20

**Exhibit A**

63.     On May 24, 2007, Syngenta filed a patent application for MIR162 in order to secure Syngenta's exclusive right to market that corn trait pending regulatory approval by the USDA.

64.     On or about September 10, 2007, Syngenta submitted a petition (the "MIR162 Deregulation Petition") seeking a determination of nonregulated status (APHIS Petition Number 07-253-01p) for corn (*Zea mays L.*) designated as transformation event MIR162, which has been genetically engineered for insect resistance, stating that corn line MIR162 is unlikely to pose a plant pest risk and, therefore, should not be a regulated article under the GMO Regulations.

65.     Upon information and belief, Syngenta continued its field tests of MIR162 under the GMO Regulations during the approximate 31-month period after filing the MIR162 Deregulation Petition and the USDA decision deregulating MIR162 in April 2010.

66.     Syngenta stated in the MIR162 Deregulation Petition that it understood "that a copy of the MIR162 Deregulation Petition may be made available to the public as part of the public comment process." MIR162 Deregulation Petition at 3 of 268. APHIS' notice, published in the Federal Register on January 13, 2010 (75 Fed. Reg. 1749) (the "MIR162 Deregulation Notice"), expressly invited public comment regarding the MIR162 Deregulation Petition and further provided instructions as to how copies of the petition and accompanying draft environmental assessment and plant pest risk assessment could be obtained either by placing a phone call or accessing them on the internet.

67.     In a preliminary observation to Section IX of the MIR162 Deregulation Petition, entitled "Adverse Consequences of Introduction" (the "Adverse Consequences Discussion"), Syngenta represented that it knew "of no data or observations that indicate [that] MIR162 would adversely impact the quality of the human environment, directly, indirectly, or cumulatively. This includes a lack of anticipated effects on . . . the economy, either within or outside the U.S."

21

**Exhibit A**

68.     Specifically, among the matters addressed in the Adverse Consequences Discussion were "Economic Impacts" at Section IX.D. In the introduction to that section, at pages 108-109, Syngenta stated:

> Economic considerations are not explicitly described in the factors listed in 40 CFR § 1508.27. However, economic impacts do relate to the significance of the requested action and have been considered by some courts in reviewing NEPA [National Environmental Policy Act] compliance.

69.     The economic impacts discussed included the "Effects on the Export Market," at Subsection IX.D.4, page 111, which included Syngenta's representation that "there should be no effects on the U.S. maize export markets" and advised that applications for approval of MIR162 maize were in process in a number of such export markets with "functioning regulatory systems," including China, stating:

> There should be no effects on the U.S. maize export market since Syngenta **is actively pursuing regulatory approvals** for MIR162 maize in countries with functioning regulatory systems for genetically modified organisms and that import maize from the U.S. or Canada. Regulatory filings for MIR162 maize are in process for Colombia, Japan, South Korea, Taiwan, China, the Philippines, Australia and New Zealand, South Africa, the European Union, Russia, and Switzerland. (emphasis added).

70.     Other portions of the MIR162 Deregulation Petition made similar representations regarding China.

71.     Syngenta also stated in Subsection IX.D. of the MIR162 Deregulation Petition that stewardship agreements with growers would require channeling of MIR162 away from export markets which had not approved import of MIR162 maize, that Syngenta would undertake "a wide-ranging grower education campaign" respecting channeling, and that channeling would be effective based upon prior experiences with the specialty maize market:

22

**Exhibit A**

Syngenta's stewardship agreements with growers will include a term requiring growers to divert this product away from export markets (*i.e.* channeling) where the grain has not yet received regulatory approval for import. Syngenta will communicate these requirements to growers using a wide-ranging grower education campaign (*e.g.*, grower Stewardship Guide). As noted in the context of the IRM program, these procedures are not hypothetical.

The ability to channel particular types of maize for particular uses, such as the export market, is demonstrated by the continuing success of the specialty maize market. Use of identity preservation measures has enabled growers to maintain a wide variety of specialized maize products, including white food maize, waxy maize, hard endosperm maize, high oil maize, nutritionally enhanced maize, high extractable starch maize, non GMO maize, and organic maize (U.S. Grains Council, 2006). Channeling programs are well established for separating each of these maize varieties.   As set out above, these practices have continued successfully long after the introduction of numerous varieties of transgenic maize.

72.     Upon information and belief, the stewardship agreements to which Syngenta referred would have been between growers and Syngenta Seeds.

73.     In December 2009, based upon its review of the MIR162 Deregulation Petition, APHIS prepared a Draft Environmental Assessment which parroted what Syngenta had represented in the MIR162 Deregulation Petition:

There should be no effects on the U.S. corn export market since Syngenta is actively pursuing regulatory approvals for the MIR162 corn in countries with functioning regulatory systems for genetically modified organisms and that import corn from the U.S. or Canada. Regulatory filings for the MIR162 corn are in process for . . . China.

74.     The Draft Environmental Assessment was among the documents publicly available under the MIR162 Deregulation Notice.

75.     On April 12, 2010, APHIS concluded that MIR162 corn should be deregulated. *See* Determination of Nonregulated Status for MIR162 Corn, April 12, 2010. *See* Syngenta Biotechnology, Inc. Determination of Nonregulated Status for Corn Genetically Engineered for

23

Insect Resistance, 75 Fed. Reg. 20560 (April 20, 2010).

76.     Prior to making that determination, APHIS, on April 9, 2010, issued its National
Environmental Policy Act Decision and Finding of No Significant Impact and, in March 2010,
issued its Final Environmental Assessment. APHIS compared anticipated impact by taking no
action (*i.e.*, keeping MIR162 as a regulated article) with deregulating MIR162 and concluded in
the Finding of No Significant Impact that in each instance the impact upon the "Export Market"
would remain "unchanged." Similarly, in the Final Environmental Assessment dated March 2010,
APHIS adopted and repeated Syngenta's representations that it did not expect any effects on the
United States corn export market "by the cultivation of the MIR162 corn cultivars" and that
applications to countries with functioning regulatory systems, including China, were in process.

77.     Thereafter, on April 21, 2010, Syngenta issued its press release, "Syngenta receives
approval for breakthrough corn trait technology in the U.S." (April 21, 2010).  In making the
announcement that MIR162 had been deregulated, Syngenta noted the plans for its imminent
commercialization, stating that "[t]he trait will be combined with the Agrisure 3000GT trait stack
to provide corn growers with broad-spectrum, insect control and glyphosate tolerance for
maximum convenience and productivity" that that "Syngenta plans to commercialize hybrids
containing the Agrisure Viptera® trait for the 2011 growing season."

78.     The April 21, 2010, press release confirms that the MIR162 Deregulation Petition
was a document prepared and published by Syngenta for the sole purpose of facilitating, promoting
and inducing the commercial sale of its products containing MIR162 maize.  The MIR162
Deregulation Petition contained statements and representations to induce APHIS to deregulate
MIR162, thereby beginning the commercialization of the product.  Further, the MIR162
Deregulation Petition was filed with full knowledge that the statements and representations therein

24

would be published to stakeholders – including the intended purchasers and distributors of Syngenta's products. The commercial nature of the statements in the MIR162 Deregulation Petition are clear: In explaining the rationale of the MIR162 Deregulation Petition, Syngenta stated therein that "[t]ransformation event MIR162 maize has been developed by Syngenta to provide growers with maize varieties that are resistant to feeding damage caused by a number of significant lepidopteran insect pests. *This trait will be offered to growers in combination with other deregulated maize traits.*" MIR162 Deregulation Petition at 11 (emphasis added). The MIR162 Deregulation Petition not only espoused the sale of the product to growers, it was rife with statements and representations about the commercial benefits of Syngenta's product and expected market impact thereof. Among other indications that the MIR162 Deregulation Petition was a document in which commercial representations and statements were made are the following:

a.   "Transformation event MIR162 has been developed by Syngenta to provide U.S. growers with maize hybrids that are resistant to feeding damage caused by a number of lepidopteran insect pests ... Commercialization of this new trait has the potential to reduce conventional insecticide use in maize, increase grower profits, and improve grain quality." (p. 13);

b.   ". . . [I]t [MIR162] will be commercialized as a combined-trait hybrid with Syngenta's Bt11 maize event." (p. 96);

c.   Syngenta's numerous references to and representations regarding the commercial benefits to farmers from introduction of MIR162 (*see, e.g.*, pp. 5, 97, 109 [enhanced productivity], p. 110 [increased competition and farmer and consumer choice]);

d.   Syngenta's repeated observations that no adverse consequences should occur to the economy, either within or outside the U.S. (*see e.g.*, p. 5) and the statements regarding the lack of impact upon exports and intended channeling away from export markets which had yet to approve MIR162, as alleged above;

e.   An appendix report regarding the economic implications of the introduction of MIR162; and

f.   Syngenta's acknowledgement that the MIR162 Deregulation Petition would

25

**Exhibit A**

be made available to the public as previously alleged (p.3).

79.     Contrary to Syngenta's representations that its regulatory filings were "in process" in China, Syngenta first sought regulatory approval for MIR162 from China's Ministry of Agriculture three years later in or around March 2010. *See* http://www.syngenta-us.com/viptera_exports/images/MIR162-Regulatory-Timeline-9-2014.pdf.

80.     Consistent with its statements to the USDA in the Deregulation Petition, Syngenta considered China to have a functioning regulatory system. Charles Lee, Syngenta's Head of Corn for North America, has testified:

> Q: All right. Does China have a functioning regulatory system as you use that term?
> A: Yeah. So I believe BIO is very specific about what a functioning regulatory system is that, you it protects intellectual property. It operates on a set of defined timelines and we would consider that to be functioning.
> Q: So yes, China has a functioning regulatory system?
> A: Yes.
> Q: And to your understanding they did in 2010 as they do today?
> A: Yes.

Charles Lee Deposition (9/7/2011) (*Bunge*) at 72-73. *See also* NGFA Newsletter dated July 14, 2011 ("China is one of the countries that has a functioning, predictable and science-based regulatory system for approving bio-enhanced events.").

***Syngenta's Initial Commercialization***

81.     As Syngenta knows, nothing about USDA deregulation requires a developer like Syngenta to commercialize. *See* Charles Lee Deposition (9/7/2011) (*Bunge*) at 69-72.

82.     Responsible practice dictated that Syngenta obtain import approval from key market countries prior to commercialization (at minimum, before first planting). *See, e.g.,* BIO Product Launch Stewardship, December 10, 2009, at 4.

26

**Exhibit A**

83.    As early as 2009, Syngenta itself was referring to China as a "Key" export country. *See* Viptera Timeline Storyboard Discussion dated March 29, 2009 (listing "Key Export Approvals," including China and stating: "China import approvals???").

84.    In discussing countries for which regulatory approval should be obtained prior to commercialization, Syngenta's Miloud Araba identified the "key countries" that would "probably be considered the minimum for corn" to include China. *See* Email from Miloud Araba to Kevin Turnbald et al., dated September 29, 2010.

85.    In a presentation to the NGFA in 2010, Syngenta listed China as among "key import approvals" it was or would be seeking. *See* Powerpoint entitled "2010 Syngenta Pipeline," Presentation to the National Grain and Feed Association.

86.    Syngenta, however, well knew that it would not have import approval from China for the 2011 crop year.

87.    The typical time period for import approval from China during this time period was approximately 2-3 years.

88.    Syngenta was not even projecting approval from China for the 2011 crop year but rather, hoping for approval by the 2012 crop year. A Syngenta Powerpoint Presentation dated July 20, 2010 contains a chart showing submission and anticipated approval dates by country. This chart indicates that Syngenta requested import approval from China on March 1, 2010 and anticipated approval by May 10, 2012. *See* Syngenta Powerpoint dated July 20, 2010.

89.    In a deposition in the *Syngenta v. Bunge* case, Syngenta's North American head of Corn, Charles Lee, revealed that Syngenta privately planned from the outset to commercialize Agrisure Viptera® with or without China's regulatory approval, notwithstanding the commitments

27

**Exhibit A**

it had made to stakeholders and industry participants not to commercialize genetically modified traits until after approval from key export markets.

90.     Syngenta commercialized Agrisure Viptera® for the 2011 growing season despite the lack of regulatory approval from China, and despite Syngenta's knowledge that China was a key (and growing) export market for U.S. corn.

91.     Syngenta did not disclose these facts to growers. *See, e.g.*, Email from Bryan Young, Burrus Seed Farms, Inc. dated August 4, 2011 ("I think this is very poor of Syngenta by getting the trait out there and not telling us it wasn't approved."

92.     Syngenta was well aware in 2010 of the strong likelihood that China would be a significant import market by 2011. After reviewing a USDA Forecast of China's 2010-2011 Crops and Trade, Syngenta's John Bernens stated in an email dated May 13, 2010: "Look at the stocks to use ratio. The fear of China's approvals might be bigger than anyone thought."

93.     It was well known at least by August 2010 that China was an important and growing export market for US corn. As reflected in a trade publication at the time:

> China is entering a 'new era' of corn buying. The world's most populous country may import as much as 15 million tons of corn in 2015, according to the U.S. Grains Council. . . . Chinese imports of corn will grow from 1.7 million tons in 2010 to 5.8 million tons in 2011, and to 15 million tons in 2014-15, according to Hanver Li, Chairman of Shanghai JC, speaking to the U.S. Grains Council . . . Where will China import all this corn from? The first place they will turn is the U.S., which is the world's largest corn exporter, accounting for 60% of global corn exports in 2009 . . . If China imports an incremental 600 million bushels of corn in 2014 from the U.S., using the USDA's baseline projections, U.S. corn ending stocks would be 960 million bushels. This would put the Ending Stocks to Use Ratio at 6.3%, the lowest level since 1995. 2010 is a major turning point in the grain market. The Chinese transition to becoming a net importer of corn will have a substantial implication on the world's corn supply.

http://www.farmlandforecast.com/2010/08/chinese-imports-to-change-grain-markets/

**Exhibit A**

94.     Syngenta was, and continues to be, a member of the U.S. Grains Council, to which Mr. Li made his presentation. Indeed, Syngenta's Rex Martin has, upon information and belief, actively participated as a member of the Council's Biotechnology Advisory Team.

95.     In addition, NAEGA warned Syngenta of the importance of obtaining Chinese regulatory approval prior to launch during a meeting in or around August 2010 with NGFA's Biotechnology Committee. *See* NGFA Newsletter dated July 14, 2011. The same issue was discussed at the subsequent NGFA Biotechnology Committee meetings – once during the March 2011 convention and another conducted on June 29, 2011 in Washington.

96.     Syngenta knew of NAEGA's warning by the summer of 2010 and also knew of NAEGA's position that import approval should be obtained from China before marketing MIR162. *See* John Bernens Deposition (11/2/2012) (*Bunge*) at 215-221.

97.     Bernens made everyone at Syngenta aware of NAEGA's position, but Syngenta refused to stop marketing and sale of Agrisure Viptera® in 2010 for planting and harvest in 2011. *Id*. at 222-223.

98.     In the fall of 2010, NGFA, in a private meeting with David Morgan, Regional Director of North America and President of Syngenta Seeds, also urged Syngenta to delay commercialization of Agrisure Viptera®, emphasizing the risk of trade disruption with China.

99.     On October 29, 2010, a Reuters article was circulated among Syngenta executives stating: "Chinese corn imports have rocketed this year and are expected to continue growing next year, after China's own harvest couldn't keep up with a boom in demand . . . ." Email chain ending with Jack Bernens dated October 29, 2010 attaching and discussing Reuters article.

100.    Evidence of China's importance continued to mount prior to planting in 2011.

**Exhibit A**

101.   In January 2011, Syngenta employees prepared written responses to questions posed by Thrive Magazine. They responded to one of the questions: "China has moved from an insignificant [sic] importer of U.S. corn to the second most important market for U.S. corn." Email chain between Charles Lee and Dianne Mayhart dated January 25-26, 2011.

102.   The USDA's long term projections, compiled in November 2010 and issued in February 2011, forecast dramatic increases in China's imports of corn from the USDA's prior year's projections. As stated by the USDA, the "increase in China's imports account for one-third of the growth in world corn trade."

103.   On February 9, 2011, the CEO of Syngenta AG, Mike Mack, stated that China's "import requirements alone influence global commodity prices." Syngenta 2010 Full Year Results, Remarks of Mike Mack.

104.   On February 25, 2011, Syngenta's Head of Industry Relations corresponded with the Head of Syngenta's Southeast Asian Territory as follows:

> I believe I have discussed with you several times about our risk with MIR162 and not having approval in EU and China. I have been getting more questions from traders . . . lately and [Charles Lee, Head of Corn for North America] wanted me to be sure you understood the potential risk for China.

105.   At the time it was marketing and selling Agrisure Viptera® – and before planting in 2011, Syngenta clearly knew of China's importance.

106.   Syngenta could, and should, have waited to market Agrisure Viptera®. It also could, and should, have withdrawn it from the market before planting but did not.

107.   To the contrary, and despite the risks, Syngenta Seeds sold Agrisure Viptera® to approximately 12,000 corn producers with a projected yield estimated in September 2011 of 250 million bushels. *See Syngenta v. Bunge*, 820 F. Supp. 2d 953, 958 (N.D. Iowa 2011). Viptera®

**Exhibit A**

growers could be found in nearly every state such that the market for Viptera® products was very broad across the United States. *See id.* at 963. Syngenta projected that Agrisure Viptera® seed sales would exceed twenty percent (20%) of the United States corn seed market in future years. *See id.* at 958.

108.    Other published estimates indicate that during the 2011 crop year, Agrisure Viptera® had been planted on 1.1% of the acres in the U.S. on which corn had been grown. *See* Paul Christensen, Chinese Approval of Syngenta Agrisure Viptera®, Seed in Context Blog: Commentary of the World of Seed. (http://intlcorn.com/seedsiteblog/?tag=syngenta).

***Syngenta's Continuing Irresponsibility After 2011 Planting***

109.    After planting but before harvest in 2011, the importance of China, and the risk of MIR162 contamination and market disruption, just continued to grow.

110.    A July 13, 2011, internal e-mail attached a news article projecting that China "will probably buy 5 million metric tons this year from 2 million tons in 2010." Email from Paul Minehart to Charles Lee and others dated July 13, 2011.

111.    On July 22, 2011, Syngenta's CEO Mack stated: "The need to improve yield and quality is present across all emerging markets in the region, although it's China which continues to have the greatest impact on world markets, with increasing imports not just of soybeans but also now of corn." July 22, 2011 Transcript of Remarks (http://www.syngenta.com/global/corporate/SiteCollectionDocuments/pdf/transcripts/H1-2011-results-transcript.pdf).

112.    An internal August 16, 2011 e-mail from Syngenta's Trait Marketing Manager, Quinn Showalter, confirms that Syngenta was well aware of the increased importance of China as a corn importer:

31

**Exhibit A**

> The issue that has surfaced is that China has become a larger corn importer after the planting season finished. China placed initial large orders including the 2011 corn crop with grain handlers around the first of July of this year. Last year, the U.S. exported 1.7 million tons of corn to China. That number is expected to increase 50% this year to 3 million tons - - the highest import quantity in 16 years.

Email from Quinn Showalter to Charles Lee and others dated August 16, 2011.

113.   Of course, the fact that China would be a significant importer in 2011 had not just "surfaced" but had been known by Syngenta for some time.

114.   In August 2011, still before the first commercially grown corn planted with the MIR162 trait had been harvested, NGFA and NAEGA issued a Joint Statement warning Syngenta about MIR162:

> U.S. farmers, as well as the commercial grain handling and export industry, depend heavily upon biotechnology providers voluntarily exercising corporate responsibility in the timing of product launch as part of their product stewardship obligation . . .The negative consequences of overly aggressive commercialization of biotech-enhanced events by technology providers are numerous, and include exposing exporting companies to financial losses because of cargo rejection, reducing access to some export markets, and diminishing the United States' reputation as a reliable, often-preferred supplier of grains, oilseeds and grain products. Premature commercialization can reduce significantly U.S. agriculture's contribution to global food security and economic growth.

> Putting the Chinese and other markets at risk with such aggressive commercialization of biotech-enhanced events is not in the best interest of U.S. agriculture or the U.S. economy.

115.   As stated by these associations: "The grain handling and export industry have communicated consistently, clearly and in good faith with biotechnology providers and seed companies about the importance of biotech-enhanced events in commodity crops receiving regulatory approvals or authorizations -- prior to commercialization -- in key export markets where foreign governments have functioning regulatory systems that approve biotech-enhanced traits.

3668354.1

**Exhibit A**

These communications regarding key export markets, identified through market and trade assessments, have been conveyed through industry trade associations and in direct communications by individual companies." *Id.*

116.    At least by September 2011, Syngenta's own business partners were saying that China was "major importer" of U.S. corn. *See* Email from Clayton Becker dated September 16, 2011.

117.    A report from the U.S. Grains Council President Thomas Dorr on his July 2011 trip to China, obtained from Syngenta's document production, was equally blunt: "The likelihood of U.S. corn entering the China market with this unapproved market is substantial." *See* U.S. Grains Council Trip Report by Thomas Dorr dated July 22, 2011 at 1.

118.    That warning was very valid. Not only did Syngenta commercialize Agrisure Viptera® prematurely, it did so without adequate systems in place to either isolate MIR162 or channel it away from markets, including China, from which approval was not obtained.

*Transgenic Contamination*

119.    Corn, or maize, has staminate (male) and pistillate (female) flowers on the same plant and is wind pollinated. While there is some possibility of self-fertilization, corn generally is considered an outcrossing species. Under normal field conditions some 95% of the ovules are fertilized by pollen from other plants. Pollen is released in large quantities. "Individual corn plants produce 4 to 5 million pollen grains. Therefore, even if only a small percentage of the total pollen shed by a field of corn drifts into a neighboring field, there is considerable potential for contamination through cross pollination." Thomison, "Managing "Pollen Drift" to Minimize Contamination of Non-GMO Corn," Ohio State University Extension Fact Sheet.

120. "Once released from the tassels into the air, pollen grains can travel as far as 1/2 mile (800 m) in 2 minutes in a wind of 15 miles per hour (27 km/h) (Nielsen 2003b)." Kent Brittan, "Methods to Enable the Coexistence of Diverse Corn Production Systems," University of California. Studies indicate that "cross-pollination between cornfields could be limited to 1% or less by a separation distance of 660 feet (200 m), and to 0.5% or less by a separation distance of 984 feet (300 m). However, cross-pollination frequencies could not be reduced to 0.1% consistently, even with isolation distances of 1,640 feet (500 m)." *Id.*

121. The Association of Official Seed Certifying Agencies (AOSCA) recognizes that "[a]lthough most corn pollen is deposited near its origin, isolation by very long distance (several miles) from any other corn is probably the only means of assuring complete confinement other than assuring complete asynchrony of flowering." However, "[t]he matter of whom or what entity controls the area constituting a proposed isolation zone and beyond could be crucial and/or problematic to successful confinement. AOSCA Report at 62. Assuring "complete asynchrony of flowering" also is fraught with shortcomings. For example, "[d]ifferences in maturity between the early and late hybrid may not be large enough to ensure that the flowering periods of each hybrid will not overlap, especially when certain climatic conditions may accelerate or delay flowering. Moreover this strategy will only work if [the farmer] control[s] the adjacent fields or can closely coordinate [his] corn planting operations with those of [his] neighbors." Thomison, "Managing 'Pollen Drift' to Minimize Contamination of Non-GMO Corn," Ohio State University Extension Fact Sheet.

122. In addition, "[p]lanting operations to control pollen drift are only part of the process of producing an IP corn grain crop." Thomison, "Managing 'Pollen Drift' to Minimize

34

**Exhibit A**

Contamination of Non-GMO Corn," Ohio State University Extension Fact Sheet. Other major issues include harvesting, storage, and commingling within the production and supply chain.

123.     "Different corn breeds within an individual farm are commingled at the harvesting stage. Corn from hundreds of thousands of farms is then further commingled as it is gathered, stored and shipped through a system of local, regional and terminal grain elevators. Elevators, storage and transportation facilities are generally not equipped to test and segregate corn varieties. The commingled corn is then marketed and traded as a fungible commodity." *In re StarLink Corn Products Liability Litig.*, 212 F. Supp. 2d 828, 834 (N.D. Ill. 2002).

124.     As a developer of genetic events, including genetically engineered corn, Syngenta knew or certainly should have known the very high likelihood that if commercialized, MIR162 would disseminate throughout the supply chain – in fields, storage and transportation – via the numerous routes that transgenic contamination occurs.

125.     One Syngenta representative stated: "The primary issue at hand through this entire situation is that many growers probably do not know where their Agrisure Viptera is planted (making segregation nearly impossible)." Email from Eric Anderson to Eric Carlson dated August 23, 2011.

126.     Syngenta acknowledged to Cargill that "some commingling" of Viptera® with non-Viptera® corn would occur at harvest in the fall of 2011. *See* Email chain between Charles Lee (Syngenta) and Randy Giroux (Cargill) dated August 30 - September 1, 2011.

127.     Before commercializing MIR162, Syngenta also knew the risk that MIR162 would move into export channels from planting and harvest of MIR162, knew that risk was significant, and that detection of MIR162 in markets lacking approval created significant risk of trade disruption. *See, e.g.,* Email from David O'Reilly dated October 31, 2009 (discussing planting of

35

**Exhibit A**

MIR162 in Brazil, which gave approval, the "significant risk MIR162 will be detectable in export channels before EU approvals" and "risk of disruption of Brazilian corn . . . because of detection of MIR162").

128.    Syngenta knew that MIR162 in the U.S. "could be in export channel[s]" and "be detectable in export channels" by 2011.  MIR162 & EU approvals Powerpoint attached to Email from David O'Reilly dated October 31, 2009.

129.    Syngenta's Charles Lee admitted in his deposition in *Syngenta v. Bunge* that there was a "real risk" that China would reject grain shipments due to the presence of unapproved genetically modified traits.  *See* Charles Lee Deposition (9/7/2011) (*Bunge*) at 94-95.

130.    Syngenta, however, took few to no steps to assure that MIR162 would not enter the U.S. corn supply through cross-pollination and/or commingling in fields, and took wholly inadequate steps to prevent commingling within grain elevators or otherwise within the supply chain as described below, virtually assuring that MIR162 would contaminate the U.S. corn supply in every way possible.

### Syngenta's Nonsensical And Ineffective "Stewardship" Program

131.    Syngenta's representation in its MIR162 Deregulation Petition that the "ability to channel particular types of maize for particular uses such as the export market" is demonstrated by success in the "specialty maize market" is grossly misleading.  In specialty markets like organic farming, the grower receives a premium and as such, takes the onus on himself to isolate his specialty corn crop from transgenic contamination from neighboring fields (such as spatial and temporal isolation and detasseling).  *See* Thomison, "Managing Pollen Drift in Maize Seed Production," Department Horticulture and Crop Science, Ohio State University ("Growers of value added identity preserved (IP) grains need to control pollen contamination in order to optimize

36

expression of value added traits in specialty maize and thereby obtain premiums."). The specialty seller also markets to a specialty buyer to whom he channels. Both have incentive to take all measures necessary to avoid contamination by non-specialty corn. The growing, marketing and distribution system of commodity corn is vastly different. A "Commodity Crop" is "a crop which in the ordinary course is grown using common agricultural practices and is commingled and not segregated for special handling or use when it enters the chain of commerce." Biotechnology Industry Organization, "Product Launch Stewardship: Food and Agriculture Section," November 27, 2012, at Annex 1 Introduction n.3.

132.   Syngenta knew that the commodity market is different than the specialty market. On October 26, 2007, Syngenta's Sarah Hull circulated internal Questions & Answers for upcoming meetings. One anticipated question was: "It seems that Syngenta believes a closed loop system is workable to keep unapproved product completely away from export channel . . . What do you think?" Syngenta's prepared answer was: "For specialty grain, **not commodity grain,** we do believe a closed loop, dedicated grain management system can work because the grain is contracted for a specific use and a specific end user." Email from Sarah Hull to Jeff Cox and others dated October 26, 2007, attaching "Potential Q/A for JZZ and MAFF Meetings." (emphasis added).

133.   The difficulties with channeling are illustrated by the infamous "StarLink" contamination in 2000 that was the subject of significant litigation. *See In re StarLink Corn Products Liability Litigation*, 212 F. Supp. 2d 828 (N.D. Illinois 2002). That is particularly so where, as in this case, millions of acres of the commodity to be channeled – MIR162 corn – were planted all across the U.S. Syngenta did not make even minimally reasonable efforts to do so.

37

**Exhibit A**

134. ' While misleading, Syngenta's representations to the USDA illustrate Syngenta's awareness of the kind of system designed to avoid contamination. Well-known measures in specialty markets include specifying strict containment protocols by contract (*e.g.*, cleaning combines and storage areas, isolation distances, dedicated facilities, and inspections), and tracing the product through the supply chain.

135. Syngenta, however, did not take meaningful steps to even minimize the risk of pollen-mediated gene flow and commingling of Agrisure Viptera® with non-Viptera corn.

136. Responsible stewardship procedures include, at minimum, "generally accepted best seed quality practices designed to prevent low level presence of unauthorized products and [to] minimize unintended incidental presence of products authorized in the county of production" and "[m]ak[ing] available prior to commercialization a reliable detection method or test for use by growers, processors and buyers that enables crop identity verification for intended use." *See* BIO "Product Launch Stewardship," dated December 10, 2009 Annex I, Policy Guidance; BIO "Stewardship Actions to be Taken Prior to Launching Special Traits," dated October 4, 2010, Annex 1, Policy Guidance; BIO "Product Launch Stewardship: Food and Agriculture Section," dated November 27, 2010, Annex 1 Policy Guidance.

.137. In its own 2007 launch policy, Syngenta represented that "[w]e will make available prior to commercialization a reliable detection method or test that enables event identity in the crop." BIO Product Launch Policy, Syngenta Implementation Principles (November 2007).

138. In July 2010, Syngenta executives discussed methods for detecting genetically modified traits and shared "one of the stories on MIR162 for why we need a GMOD [genetically modified organism detection] strategy." That story noted that "[a]symmetric approval of Agrisure

38

Viptera in one territory and other territory may affect the free flow of product trade." Email from Jingwen Chen to Alejandro Tozzini et al., dated July 20, 2010.

139.    Syngenta discussed, but rejected, issuing strip test kits to processing facilities and other grain handlers to reduce the risk of MIR162 entering facilities that exported to unapproved markets despite the fact that the test kits cost approximately one dollar each. *See* August 15-16, 2011 Email Chain Subject: Risk Management.  Nor did it provide another test method to farmers or grain handlers as part of a required stewardship program.

140.    Syngenta also could have contractually required that Viptera® growers adhere to stringent practices that would have decreased the likelihood of contamination.  Syngenta did not, however, because to do so would have drastically reduced or eliminated sales of that product.

141.    Instead, and contrary to requiring isolation, Syngenta Seeds gave away free bags of Viptera to farmers as part of a campaign to encourage Viptera® growers to grow Viptera® side-by-side with other corn to compare performance. *See Syngenta,* 820 F. Supp. 2d at 958.

142.    Syngenta *expected* the Viptera® corn to cross-pollinate with non-Viptera corn and, according to Charles Lee, told farmers to consider the adjacent corn Viptera® corn. *See* Charles Lee Deposition (9/7/2011) (*Bunge*) at 221-223.  Yet, there was no contractual requirement for growers to take measures to prevent such cross-pollination in their own fields, to segregate Viptera® from non-Viptera® corn or to prevent contamination of other farmers' fields.

143.    In fact, Syngenta advised at least one grower that he had no obligation to tell neighboring corn farmers or grain originators that he had planted Viptera®.  This advice was in response to the farmer's concern that he might be liable if his Viptera® corn cross pollinated with his neighbor's corn. *See* Email from Matt Tenhaeff dated September 27, 2011.

**Exhibit A**

144.    Moreover, upon information and belief, in addition to the acreage upon which Agrisure Viptera® (and later, Duracade™) have been grown from sales of those products, Syngenta has grown on land within the United States corn containing the MIR162 trait for purposes of seed increase and to develop inventories of product to sell to farmers. This additional growth further increased the presence of MIR162 within U.S. agriculture and the widespread, pervasive contamination which has caused disruption of trade in U.S. corn with China.

145.    Syngenta knew the risks. In a June 2010 "Risk Management Report," Syngenta recognized that "MIR162 [would be] detected as unapproved trait" as a consequence of large scale production "before all import approvals are in place." The report recognized that increased production in 2010 of corn containing MIR162 increased the "likelihood of MIR162 being detected as [adventitious presence] in an export channel." Syngenta classified the impact of this risk as "high." Risk Management Report dated June 2010. *See also* MIR162 & EU approvals Powerpoint attached to Email from David O'Reilly dated October 31, 2009.

146.    Syngenta's commercial sales of Agrisure Viptera® for planting, growing, and harvest in 2011 reached across the United states, covering nine hundred nineteen (919) counties and thirty-eight (38) states. *See* "Unit Stats by State and County, Viptera Only" (Lee *Bunge* deposition exhibit); *see also Syngenta v. Bunge*, 820 F. Supp. 2d at 958, 963. Despite the pervasive presence of Agrisure Viptera® and Syngenta's knowledge of the risks, Syngenta did not require growers to comply with the kind of strict measures Syngenta knew were minimally necessary in order to even have a chance at containment.

147.    Syngenta's professed "channeling" efforts, which could and should have been in place well prior to harvest in order to direct Agrisure Viptera® away from markets lacking import approval, also were wholly – and purposefully – inadequate.

**Exhibit A**

148.    In its 2007 MIR162 Deregulation Petition, Syngenta represented that a lack of Chinese approval would not pose a problem for U.S. farmers because:

> Syngenta's stewardship agreements with growers will include a term requiring growers to divert this product away from export markets (*i.e.* channeling) where the grain has not yet received regulatory approval for import. Syngenta will communicate these requirements to growers using a wide-ranging grower education campaign (*e.g.*, grower Stewardship Guide) . . . [T]hese procedures are not hypothetical.

149.    Syngenta's "stewardship" program, however, did indeed present "hypothetical" and ineffective procedures, which made contamination of the U.S. corn supply virtually certain.

150.    Contrary to representations in its MIR162 Deregulation Petition, Syngenta did not, on information and belief, institute a "wide ranging grower education campaign" through its Stewardship Agreements, Stewardship Guides or otherwise, and certainly did not do so in a manner that would be meaningful and effective.

151.    On information and belief, none of Syngenta Seeds' Stewardship Agreements with growers contained any details on Syngenta's stewardship program.  Instead, the agreement provided that growers should comply with the "most current" version of a "Stewardship Guide," which might or might not be given to them when they received the product, and was subject to unilateral change at any time via modification to a website. *See* Syngenta Seeds, Inc. Stewardship Agreement (Revised 08/2009) at 1; Syngenta Seeds, Inc. Stewardship Agreement (Revised 03/14/2011) at 1; Syngenta Seeds, Inc. Stewardship Agreement (Revised 05/11/2011) at 1; Syngenta Seeds, Inc. Stewardship Agreement (Revised 06/05/2013) at 1.

152.    In other words, Syngenta's "stewardship" program for Agrisure Viptera® depended, at the outset, on thousands of individual farmers across the country locating and

understanding a Stewardship Guide which they may well not have been provided at the time of signing the Stewardship Agreement or receiving the product.

153.    Moreover, while the Stewardship Agreements contained a provision for "channeling," they made no mention of China.

154.    The 2009 version of the Stewardship Agreement provided that the grower "agrees to: Channel grain produced from seed to appropriate markets to prevent movement to markets where the grain has not received regulatory approval for import." It does not, however, identify China as one of those markets. Rather, the agreement states that: "Grain harvested from corn hybrids containing Agrisure Technologies . . . may not be fully approved for grain export to **Japan or the European Union**" and that "grain from hybrids that do not have the appropriate import approvals from **Japan and the European Union** must be directed to domestic uses and away from export channels." Syngenta Seeds, Inc. Stewardship Agreement (Revised 08/2009) at 2 (emphasis added). There is no reference to any other unapproved markets, including China.

155.    The March and May 2011 versions of Syngenta Seeds' Stewardship Agreement said – and did not say -- the same thing. *See* Syngenta Seeds, Inc. Stewardship Agreement (Revised 03/14.2011) at 1, 2; Syngenta Seeds, Inc. Stewardship Agreement (Revised 05/11/2011) at 1, 2.

156.    Syngenta Seeds' 2013 version of the Stewardship Agreement removed the reference to Japan and the European Union, but even then did not mention China. *See* Syngenta Seeds, Inc. Stewardship Agreement (Revised 06/05/2011).

157.    None of the agreements contain any instruction on how the grower was supposed to "channel."

**Exhibit A**

158.    And Syngenta knew or should have known that bare reference to channeling (and at that, without reference to China), was ineffective. Syngenta itself has stated: "Contracts are not carefully reviewed or understood." *See* Syngenta document entitled "The Role of Grain Marketing for Future Trait Technologies."

159.    In any event, and to the extent other versions of the Stewardship Agreement (or Stewardship Guide) do reference China, the concept of "channeling" by thousands of individual corn farmers under Syngenta's non-existent or – at minimum, inadequate – "stewardship" program, was certain to fail.

160.    "Channeling" can only work if all grain handlers and others in the supply chain are engaged in that endeavor. For example, BIO recognizes that a realistic assessment of conditions related to handling, distributing, processing and testing products must engage the various stakeholders. *See* BIO Product Launch Stewardship, December 10, 2009 at Introduction.

161.    Upon information and belief, Syngenta did not obtain channeling commitments from supply chain participants, took no further action to create a marketing plan or channeling mechanism or to coordinate with grain handling, export and other post-harvest firms, to ensure that Agrisure Viptera® corn was not directed to markets for which regulatory approval had not been received, including China.

162.    This failure was purposeful. Syngenta made a decision that no special provisions would be made for grain redirection. In the summer of 2010, David Morgan agreed – reluctantly – to approve sending MIR162 seed planted prior to Japanese approval to a feedlot instead of placing it into the grain channel if Syngenta did not have to pay for it: "To be clear, if we can do this with zero cost and minimal effort and this keeps everyone 'quiet,' then why not? If otherwise

43

**Exhibit A**

then I personally don't care about channeling." Email chain including David Morgan and Jack Bernens dated June 18, 2010.

163.   Not only did Syngenta decide it would not take measures for channeling Agrisure Viptera®, Syngenta sought to *stop* exporters and grain elevator operators from attempting to "channel" Agrisure Viptera® away from China. Specifically, Syngenta brought a lawsuit against Bunge, a grain elevator operator, who refused to accept Agrisure Viptera® corn because that operator exported corn to China.

164.   On August 17, 2011, Syngenta issued a letter to Agrisure Viptera® growers expressing disappointment that Bunge and Consolidated Grain & Barge reportedly would "not be accepting grain with the Agrisure Viptera® trait." Syngenta recommended to growers that they simply "[d]eliver[] to elevators accepting grain with the Agrisure Viptera® trait." Syngenta made no mention that these elevators should channel the grain to markets in which that trait had been approved.

165.   Syngenta Seeds sued Bunge in *Syngenta v. Bunge* complaining that Bunge could not refuse to accept at its grain elevators Agrisure Viptera® corn. Bunge had posted notices at its grain elevators that it would not accept Agrisure Viptera® corn because the MIR162 trait was not then approved in China, that China had a zero tolerance policy regarding non-approved GMO events such as MIR162, and, that Bunge had significant contracts with Chinese markets which it wanted to fulfill.

166.   Syngenta Seeds filed the suit seeking an injunction to require it to accept the Agrisure Viptera® corn despite: (i) its earlier representations in the MIR162 Deregulation Petition that corn grown with its MIR162 trait would be channeled away from export markets which had not yet approved of its importation; (ii) the requirement in its Stewardship Agreement with growers

44

who had purchased Agrisure Viptera® seed requiring them to channel their harvested grain away from export markets which had not yet approved the importation of MIR162 corn; and (iii) the protocols referenced above approved by the Biotechnology Industry Organization and other organizations of which Syngenta was/is a member requiring consultation with industry stakeholders and not commercializing approved traits without major market approval.

167.    At the end of the 2010 crop year in August 2010, China had already become the seventh largest importer of U.S. corn. *See Syngenta*, 820 F. Supp. 2d at 860-61. Thereafter, in the spring of 2011, Bunge had sold millions of dollars of U.S. corn for delivery to China between September 2011 and January 2012. *Id.*

168.    The Court in *Syngenta v. Bunge* denied Syngenta Seeds' requested injunction on September 26, 2011. In denying the requested injunction, the Court found that it was foreseeable that China would not approve importation of MIR162 during the 2010-2011 crop year, that during that year U.S. exports to China might be significant, and that Syngenta Seeds had caused the very harm of which it complained. The Court refused to shift the risk to Bunge for commercializing Agrisure Viptera® prior to receipt of approval from China. Specifically, the Court in that case concluded, *inter alia*, that:

> [a]t least to some extent, Syngenta's reputational injuries [allegedly caused by Bunge's refusal to accept Agrisure Viptera®], thought significant, [were] the result of *Syngenta's* decision to commercialize Viptera corn before obtaining import approval from significant import markets, including China, where Bunge's rejection of unapproved traits was not wholly unforeseen or unforeseeable . . . . (*Syngenta*, 820 F. Supp. 2d at 988)

169.    The Court also concluded that:

> no reasonable balance of equities would impose upon Bunge the prodigious additional expense of segregating Viptera corn (or segregating non-Viptera corn earmarked for Chinese export), where Bunge did not create the situation in Viptera corn has not been yet

45

**Exhibit A**

approved for import to China. That situation arises entirely because Syngenta decided to commercialize Viptera corn knowing that it not yet have Chinese and some other import approvals and would not have them for the 2011 crop year, and under circumstances in which Syngenta should have reasonably recognized that Chinese imports of United States corn for the 2011 crop year might well be very significant. Syngenta accepted the risk of commercializing Viptera corn, albeit with more than the required or recommended import approvals, but without import approval from all of the reasonably likely foreign markets. I reject Syngenta's request that I shift that risk, instead, to Bunge . . . . (*Id.* at 990)

170.     In addition, in addressing the public interest element for injunctive relief, the Court declined to shift the risk of the decision to commercialize MIR162 away from Syngenta:

I find that the public interest strongly favors allocating the risks of a decision to introduce a new transgenic grain into the commercial market on the company that decided to commercialize that grain before obtaining all import approvals . . . . (*Id.* at 992)

171.     The Court also found that in the late summer and fall of 2011, exporters other than Bunge, including Cargill and Archer Daniels Midland ("ADM"), had also refused to accept Agrisure Viptera® at some of their facilities due to export market issues such as the failure of Syngenta to receive approval from the European Union. *Id.* at 962.

*Syngenta's Irresponsibility And Misrepresentations Moving Into The 2012 Crop Year*

172.     Despite the risk of contamination and movement of Agrisure Viptera into export markets, Syngenta continued its course and sold even more Agrisure Viptera® for planting in 2012, further increasing those risks.

173.     And Syngenta expanded sales of Agrisure Viptera® even as China was dramatically increasing imports of U.S. corn and was projected to be the largest importer of U.S. corn by the year 2020.

174.     In 2011, Syngenta was selling Agrisure Viptera® for the next growing season, 2012.

46

**Exhibit A**

175.    Syngenta was concerned.  If grain handlers like *Bunge* refused to take Agrisure

Viptera®, the lack of approval from China might reduce its sales.

176.    On June 29, 2011, Syngenta's Head of Industry Relations warned several Syngenta

executives:

> All, just want to continue to let you know the questions about
> MIR162 continue to increase Both on EU and China.  Today at
> NGFA meeting [a Cargill executive] said his export business is
> really wound up about China and MIR162 not being approved.  I
> predict we are going to have some rough water around MIR162 until
> China and EU are approved.

Email from Jack Bernens to Charles Lee, Sarah Hull, and David Morgan dated June 29, 2011.

177.    On July 1-5, 2011, Syngenta's Sarah Hull and others exchanged emails that grain

exports were beginning to erect signs announcing their refusal to accept Viptera® from growers

because of the threat posed by the lack of approval from China.  *See* Email from Jack Bernens to

Sarah Hull, David Morgan, and Charles Lee dated July 1, 2011 ("The signs are starting to go up!");

Email from Sarah Hull to Ponsi Trivisvavet dated July 5, 2011.  Syngenta's management team had

been in meetings with representatives from China, and acknowledged the risk. *See* Emails between

Andrew McConville, Sean Wang, and Sarah Hull dated July 4, 2011.

178.    On July 2, 2011, Syngenta's Head of Industry Relations sent an email to Syngenta

management, stating: "[A]s you know I have been warning of this pending potential development

for some time . . . China has become a substantial market and we could see this was going to

happen."  Email from Jack Bernens to Grant Ozipko dated July 2, 2011.

179.    Syngenta also knew by July 2011 that China would not change its zero-tolerance

policy.  On July 5, 2011, Syngenta's head of Corporate Affairs China informed the management

team: "With regard to the MoA officials . . . they reiterated . . . that at present stage, MoA will not

47

**Exhibit A**

change the GMO safety certificate (for processing) issuing system."   Email from Wang Sean to

Andrew McConville and others dated July 5, 2011.

181.    180.    Syngenta, however, chose not to inform growers and the grain industry of the

growing danger. Instead, it crafted a plan to mislead grain handlers and growers to believe that

Syngenta would have import approval from China by the time Viptera® was harvested despite all

indications to the contrary.  The purpose of this plan was to sell more Viptera®.

    181.    On July 5, 2011, Sarah Hull emailed:

> Not sure on the approval timeline . . . We get daily questions from
> the other grain traders about China and EU (Brazil trade) approvals
> . . . Most important is that we get them comfortable that the approval
> is close so they don't not only tell farmers not to bring their 162
> varieties to them but also not to buy the varieties for planting next
> year.

Email from Sarah Hull to Ponsi Trivisvavet dated July 5, 2011.

    182.    United States Grains Council President, Tom Dorr, in a memorandum dated August

2, 2011 to "Seed Technology Members" and emailed to Syngenta, stated that 'the current situation

regarding the commercialization of unapproved events in China has raised industry-wide concern

about potential near and longer-term disruption to US corn exports in China."  In the same

memorandum, he referred to China as a "major corn importer."

    183.    By at least early July 2011, Syngenta was already managing its message and had

scripted its responses.

    184.    Among other things, Syngenta launched a "blame the grain trade" campaign.  On

July 7, 2011, Syngenta's Sarah Hull stated:

> Channeling is exactly what these guys [grain handlers] need to
> accept as the way forward in general.  Will be interesting to hear
> what Cargill says since they feel they are better at managing logistic
> challenges than anyone else.  I think we have to find the right
> balance of making this a 162 problem versus an evolutionary

48

**Exhibit A**

challenge of global grain trade and adjust our actions to reflect the latter.

Email from Sarah Hull to David Morgan and others dated July 7, 2011.

185.    Syngenta remained focused on its bottom line.  Addressing a suggestion that Syngenta work "with the grain channel to avoid issues with introductions of new trait technologies," a Syngenta executive responded: "(you don't need to spend a lot of time on it) but what may not have been driven home yet is how much this potentially will cost Syngenta, how much the China thing has and IS costing Syngenta, and what it's done to sales/field perceptions." Email exchange between Jill Wenzel and John Fisher dated October 12, 2011.

186.    Syngenta internally communicated its "Yields Without Borders Program" and its "Top 10 Tactics to Energize Sales Force and Leverage Grain marketing Channel to Secure Sales." *See* Syngenta document entitled "The Role of Grain marketing for Future Trait Technologies." Part of this program was to provide regular (and misleading) updates "on progress and plans for China trait approval and to drive trait acceptance." *Id.*

187.    This was in response to, among other things, complaints by producers that they were not informed properly about issues with Agrisure Viptera® when they ordered seed. *Id.*

188.    Syngenta's goal was, among other things, to develop a "strategy moving forward to neutralize grain-marketing related barriers to acceptance of Agrisure Viptera." *Id.*

189.    Syngenta's objectives included "introduction of new trait technologies to maximize IP [intellectual property] protection window and realize income sooner on R&D investment" and to address Syngenta's "black eye" in regard to "issues of technology acceptance and grain marketing." *Id.*

190.    In order to encourage further sales and planting of Agrisure Viptera®, Syngenta, by at least August 2011, was representing to stakeholders, including corn growers, that Syngenta

49

would obtain China's approval by March 2012. *See, e.g.* Syngenta Letter to Viptera Growers dated

August 17, 2011 (stating "we are still awaiting import approval from China, which we anticipatate

in late March 2012" and that Chinese approval is "expected late March 2012").

191.   As   one   of   Syngenta's   business   partners   observed:   "communication,

communication, communication, over and over to growers is needed, even if it is repetitious

information is needed to hold Agrisure Viptera orders . . . [and to create] pull through interest in

seeds tock orders for planting the 2013 crop.  If we say March enough, there should be no issue in

ordering seed stock and seed companies will have confidence in the March date." Email from Don

Kestel dated November 30, 2011.

192.   Syngenta, however, did not have a reasonable basis to believe that approval from

China would be received in March 2012 and did not itself expect approval by that time.

193.   On July 8, 2011, the Head of Syngenta's Southeast Asian Territory wrote to

Syngenta's Head of Corn for North America:

> **Viptera China:** I'm really concerned whether Q1/Q2 2012 is still
> achievable. Could we talk on this still?

Email from Trivisvaret Ponsi to Charles Lee dated July 8, 2011.

194.   Indeed, Syngenta's approval submissions to China included insufficient, incorrect

and/or incomplete information, resulting in multiple additional submissions, and also included

significant delays by Syngenta in providing standard information.  For example, Syngenta did not

submit PCR detection methods until January 10, 2011, and had to redeliver the PCR detection

method on May 16, 2011, because the first submission was unclear.  This information was a

required precursor to testing in China, which may take – and is expected to take – months.  On

June 22, 2011, Syngenta sent a letter of correction regarding mislabeling of samples. Testing did

not begin in China until June 24, 2011.  Testing results are known requirements of completed

50

**Exhibit A**

applications. Even after an application is complete, review and deficiency notices, requiring correction, are not atypical but expected.

195.    In a July 6, 2011 email to Syngenta Executive Charles Lee, Lisa Zannoi admitted: "We had a year delay due to an internal restriction on shipping seeds to China needed to start the field testing."  Email from Zannoni to Lee dated July 6, 2011.

196.    Before, but at least as of July 2011, Syngenta knew it could not expect approval by March 2012.

197.    Syngenta's own employees recognized that approval would take significantly longer.

198.    Brian Walsh emailed Katie Gutzmann on July 1, 2011 that Agrisure Viptera® would not receive import approval from China "for a few years yet." Email from Brian Walsh to Katie Gutzmann dated July 1, 2011, Mr. Walsh continued:  "The good news is that most of Monsanto's new traits aren't approved either . . . All other major countries approved Viptera." *Id.*

199.    In further discussion on this topic on July 5, 2011, Quinn Showalter asked: "Do you have any insights regarding when [Monsanto] might get approval . . . If they aren't being restricted by [Consolidated Grain and Barge], it may be due to an anticipated approval vs. ours which I believe is anticipated in 2014." Email from Quinn Showalter to Araba Miloud dated July 5, 2011.

200.    Syngenta received field trial and safety test results in October and November 2011, respectively. Syngenta submitted these results in a now-completed application on November 9, 2011. At that point also, Syngenta knew or clearly should have known that it would not have approval by March 2012.

3668354.1

**Exhibit A**

201.   As of May 2012, China's Ministry of Agriculture had reviewed Syngenta's application and had rejected it for deficiencies including all applicable safety analyses. Syngenta submitted another application in June 2012.

202.   In addition, on information and belief, Syngenta sought approval to cultivate MIR162 in, as well as import MIR162 to China. *See* Reuters "Update 1 – Syngenta confirms it applied to cultivate GMO corn in China" (Oct. 8, 2014) (http://www.reuters.com/article/2014/10/08/china-gmo-syngenta-idUSL3N0S317520141008). *See also* APAC Regulatory Strategy for Cultivation Approval dated January 19, 2009.

203.   Upon information and belief, China has more severely restricted the right to cultivate bio-engineered crops than to import them, has not previously allowed any such cultivation by a foreign firm without Chinese participation, and has taken significantly longer to approve cultivation applications than importation applications, all of which may have materially delayed import approval.

204.   Syngenta was projecting that cultivation approval would not be obtained until 2016. *See* APAC Regulatory Strategy for Cultivation Approval dated January 19, 2009.

205.   Syngenta continued to downplay the importance of China and misrepresent the status of China's approval for the purpose of increasing sales of Agrisure Viptera®.

206.   Syngenta was far more focused on a potential loss of profits than it was on the risk of trade disruption caused by Agrisure Viptera®.

207.   Syngenta was analyzing the potential that Viptera® purchasers might return seed, and was looking at its prior experience in 2007 when it commercialized MIR604 prior to Japan approval. *See* Email from John Fisher to Jack Bernens and others dated November 9, 2011.

52

**Exhibit A**

Syngenta's Product Lead for Commercial Traits took glee at the fact that a U.S. seed shortage would work in Syngenta's favor, forcing growers to "roll the dice" with Viptera

> One heads-up from today's Agrisure Viptera core team call –approx. 750,000 of our approx. 1MM units are already ordered and we anticipate the remainder will be ordered by year's end. The industry-wide short supply of seed will work in our favor. . . . Hence key business issue is more the black-eye we now have, vs. actual impact on sales. . . .
>
> **The issue will be if they [growers] return it, they likely won't be able to replace it. Poor things will have to roll the dice.**

Email from Jill Wenzel to John Fisher and Jim Gresham dated November 11, 2011.

208.   As Syngenta continued to make its misrepresentations and the presence of Agrisure Viptera® continued to spread, so did the risk of contamination of the U.S. corn supply with MIR162 – and the risk of market disruption. And Syngenta knew it. On July 11, 2011, Syngenta's Head of Global External Affairs, Sarah Hull, emailed other Syngenta executives regarding a plan devised with Syngenta's Michael Mack, to convince China to speed up its approval. Mr. Mack "want[ed] the Chinese to know that every ship carrying corn into China this fall will have 162 in it at some level." Email from Sarah Hull to Charles Lee (cc: David Morgan) dated July 8, 2011. Ms. Hull asked for information to verify numbers supporting that message:

> I need to pull some numbers together to make this a fact-based argument and wondered who could help me.
>
> We know that US plantings of [MIR]162 = 540,000 bags, representing 1.6% of the total corn market. I assume this is consistent with your citing ¼ billion bushels of Viptera grain is in fields today, but will you verify these facts? *Id.*

209.   Ms. Hull acknowledged that (contrary to earlier representations to the USDA that MIR162 could be effectively channeled like specialty maize), the ability to channel in a "closed loop" system is much different than a commodity crop. She noted: "I know we need to be careful

53

not to undermine our position that we can successfully grow products in closed loop systems such as Enogen [corn developed by Syngenta for ethanol production], but I think we have to do what we can to get China to speed up this review.  *Id.*

210.   The plan was for Syngenta to compare prior Syngenta contamination incidents (MIR604 and Bt10 corn) with the presence of MIR162 in the U.S. corn supply in order to show with dispersion modes "that under 0 tolerance even very little in the system had extensive hits." This, Ms. Hull said, should convince U.S. Government officials to convey to Chinese officials the need to approve MIR162 "or put US corn trade at serious risk."  *Id.*

### Syngenta's Continued Deception Regarding China's Approval Of MIR162

211.   Syngenta continued its deception regarding the status of approval from China throughout 2012.

212.   Despite knowing that its incomplete and delayed regulatory filings with China assured that Syngenta would not obtain import approval for Viptera by March 2012, Syngenta nevertheless instructed employees to tell grain handlers:  "We are still on schedule to obtain approval from China by March of 2012 . . . we have not received any indication that China approval will be delayed."  Email from March Sather dated January 2, 2012.

213.   After the first quarter of 2012 had passed without approval from China, Syngenta told its employees to **"verbally"** (emphasis in original) communicate that Syngenta "continue[s] to anticipate that this approval will be received shortly."  Email from Lori Thomas to DL NAFTA list serve et al., dated April 8, 2012.

214.   On or about April 10, 2012, Sarah Hull emailed Rex Martin, Syngenta's representative to the U.S. Grains Council, stating: "We need to get some indication to growers or [NCGA] that China Viptera approval is done and is only waiting for the administrative signatures

**Exhibit A**

. . . David [Morgan] and Chuck [Lee] said growers are starting to return seed and *we need to try to stop this*." Email from Sarah Hull to Rex Martin dated April 10, 2012 (emphasis added).

215.    About a week later, during Syngenta's first quarter 2012 earnings conference call on April 18, 2012, Syngenta's Chief Executive Officer, Michael Mack, publicly stated that he expected China to approve Agrisure Viptera® "quite frankly with in the matter of a couple of days." http://www.morningstar.com/earnings/37715637-syngenta-ag-adrsyt-q1-2012-earnings-call-transcript.aspx. This, of course, was a year after Syngenta had already sold large quantities of Agrisure Viptera® to farmers across the country.

216.    On information and belief, however, Syngenta did not as of April 2012 have a reasonable basis for a belief that China's approval was "done," or its representation that approval was imminent. Syngenta certainly did not have any sort of official approval at this juncture.

217.    Indeed, Syngenta received a rejection and deficiency letter from China's Ministry of Agriculture on May 15, 2012.

218.    Syngenta also distributed misleading written materials indicating that Agrisure Viptera® *could* be exported to China.

219.    For example, Syngenta distributed a "Request Form for Bio-Safety Certificates Issued by the Chinese Ministry of Agriculture" for Agrisure Viptera®. In China, "Bio-Safety Authorizations" are required for the issuance of shipment-specific "Bio-Safety Certificates." However, applying for shipment-specific Bio-Safety Certificates was and is pointless because MIR162 has not been approved for importation in China.

220.    Syngenta knew that its Request for Bio-Safety Certificates Forms was pointless but distributed it in an effort to mislead U.S. farmers.

55

221.    Syngenta also distributed a "Plant with Confidence Fact Sheet," which contains

deceptive statements regarding the importance of China as an export market. http://www.syngenta-

us.com/viptera_exports/images/Agrisure-Viptera-Fact-Sheet.pdf. For example, the "Plant with

Confidence Fact Sheet" states:

> The vast majority of corn produced in the U.S. is used domestically.
> There is a misconception that China imports more grain than it
> actually does from the U.S. China has imported, on average, a little
> more than half of one percent – 0.5% – of all U.S. corn produced in
> the past five years. . . .
>
> Since very few U.S. grain outlets actually export to China, most
> have no reason to restrict your right to plant the latest technologies.

http://www.syngenta-us.com/viptera_exports/images/Agrisure-Viptera-Fact-Sheet.pdf (emphasis

removed).

222.    Contrary to the Plant with Confidence Fact Sheet, the NGFA reports:

> The U.S. Department of Agriculture (USDA) forecasts that China
> will become the world's largest corn importer by 2020. China is
> projected to increase its corn imports to 22 million metric tons (866
> million bushels) by 2023, up from 2.7 million metric tons (106
> million bushels) in 2012. For 2013, USDA had projected that the
> United States would export 37 million metric tons (1.457 million
> bushels) of corn, and that China would import an estimated 7 million
> metric tons (276 million bushels) – virtually all of it from the United
> States.

http://www.ngfa.org/wp-content/uploads/NGFA-Flyer-for-Farmer-Customers-on-Potential-

Market-Impacts-of-Commercializing-Biotech-Enhanced-Seeds-Not-Approved-for-Import-into-

U.S.-Export-Markets.pdf.

223.    In other words, for 2013, the USDA estimated that China represented nearly 20%

of the U.S. export market.

**Exhibit A**

224.    Prior to China's discovery in November 2013 of MIR162 in U.S. corn shipments, China was the third largest market for U.S. corn and China's share of our market was projected to grow substantially. China is by far the largest potential growth market for U.S. corn.

*Syngenta Continued To Expand Sales Of Agrisure Viptera® Acreage Despite No Approval from China And While The Importance Of The Chinese Market Continued To Increase*

225.    China continued to be a major and growing market for U.S. corn and corn products during the 2012 and 2013 crop years.

226.    However, during that period, China still had not yet approved the import of MIR162. Syngenta was still in the approval process, and correcting deficiencies identified by the Ministry of Agriculture. It had no assurance that approval would be conferred by the 2013 crop year. In fact, as October 2013, Syngenta was still completing required research for its application.

227.    Corn industry groups continued to object to Syngenta Seeds' commercialization of Agrisure Viptera®.

228.    In fact, during 2012/13, China had become the third largest export market for U.S. corn. As reported by the Iowa Corn Growers Association, "[i]n 2012/13, China was the third largest export market for U.S. corn and up until the recent issue [the rejections beginning in November 2013] [China] was on track to meet or exceed that position." China and MIR162, 2-2014, Iowa Corn Growers Association, Feb. 6, 2014.

229.    Nevertheless, Syngenta continued to market Agrisure Viptera® during the 2012 and 2013 crop years. Estimates were that during this period Syngenta had increased the market share of its Agrisure Viptera® corn to well more than 2%, and, by some estimates as high as 3.5%, of the corn area grown in the U.S. Christensen, "Viptera Could Have Been Approved for Importation Into China, But Was Not," Seed in Context Blog, April 13, 2014 (http://www.intlcorn.com/seedsiteblog/?p=1891).

57

3668354.1                                                                    **Exhibit A**

230. This increase further assured that Agrisure Viptera® would disseminate throughout the U.S. corn supply and that it could not – and would not – be channeled away from export markets, such as China, which had not approved MIR162.

*Regulation, Testing And Deregulation Of Event 5307*

231. On April 22, 2011, just months after Syngenta Seeds had released Agrisure Viptera® for the 2011 crop year, Syngenta filed with APHIS a petition seeking the deregulation of another insect resistant, genetically modified trait known as Event 5307. Event 5307 was ultimately deregulated by APHIS on January 29, 2013.

232. Between 2005 and 2011, Syngenta conducted at least 101 field trials of Event 5307 corn under at least 22 notifications made to APHIS under the GMO Regulations at sites in 23 states.

233. Upon information and belief, at least some of the field trials of Event 5307 included tests of corn stacked with multiple traits, including the presence of both Event 5307 and MIR162. Further, upon information and belief, field tests conducted under the GMO Regulations of Event 5307, either singly or together with other traits, including MIR162, continued during the period after the filing of the Event 5307 Deregulation Petition and the January 29, 2013 decision to deregulate Event 5307.

234. In its deregulation petition for Event 5307, Syngenta disclosed that upon deregulation of Event 5307, Syngenta Seeds did not intend to market Event 5307 as a stand-alone product, but intended to combine it with other traits, including MIR162. It also stated that it intended to seek approval of products containing Event 5307 in countries which had functioning regulatory systems and that "Syngenta is also pursuing regulatory approvals for importation of corn commodities and processed goods containing 5307 corn in key export markets for U.S. and

58

Exhibit A

Canadian corn" and that applications were currently planned for a number of additional countries, including China. In the discussion of "Adverse Consequences of Introduction," Syngenta stated that an upcoming Environmental Report would discuss a range of issues related to the deregulation of Event 5307 corn, "including any potential direct, indirect or cumulative impacts on . . . the economy, either within or outside the U.S." Petition for Determination of Nonregulated Status for Rootworm-Resistant    Event    5307    Corn,    April    22,    2011,    at    156 (http://www.aphis.usda.gov/biotechnology/petitions_table_pending.shtml).

235.    Following approval of Event 5307, Syngenta Seeds announced that it would commercialize its Agrisure Duracade™ for the 2014 crop year containing both Event 5307 and MIR162, despite the continued failure to obtain approval from China for MIR162 and the fact that Event 5307 also had not been approved.

### Commercialization Of Agrisure Duracade™ Despite MIR162's Continued Disruption Of The U.S. Corn Trade

236.    In November 2013, China began rejecting shipments of U.S. corn which tested positive for the presence of MIR162. Syngenta has, nevertheless, continued its false statements and misrepresentations, as alleged herein, including through its decision to market for the 2014 crop year Agrisure Duracade ™.

237.    The National Grain and Feed Association has detailed the disastrous results of China's rejection of U.S. corn based upon the presence of MIR162:

> This development resulted in a series of trade disruptions –
> including testing; delays in vessel discharge; and deferrals,
> diversion and rejections of cargoes – when MIR162 subsequently
> was detected in U.S. shipments of corn and distillers dried grains
> with solubles (DDGS). These disruptions effectively shut U.S. corn
> farmers out of China's feed grain import market, which previously
> almost exclusively had been supplied by the United States. **China
> subsequently has taken actions to utilize domestic, as well as
> international alternatives to U.S. corn. For instance, China's**

· 59

> imports of U.S. grain sorghum have increased significantly.
> China also has sourced corn from Ukraine. And most recently,
> Brazil and Argentina each were granted approval to begin
> exporting corn to China. . . .
>
> This disruption, tied to positive detections of MIR 162 that began in
> November 2013, has virtually halted U.S. corn trade with China. . .
> . .
>
> USDA currently is projecting Chinese corn imports will reach 22
> mmt [million metric tons] by 2023, which if realized would account
> for nearly half of the projected growth in total world corn trade.
> However, **if the MIR 162-related trade disruption continues,
> other corn exporting nations, such as Ukraine, are capable of
> replacing the United States as the principal corn exporter to
> China. . . .**
>
> [T]he MIR 162-induced trade disruption has resulted in market price
> loss on unfulfilled export sales, price loss on diverted sales because
> of the compromised economic negotiating position of U.S.
> exporters, demurrage costs, and lower market prices for U.S.
> commodities and products. **The total loss for these sectors of the
> U.S. grain industry is estimated to range from $1 billion to $2.9
> billion.**

http://ngfa.org/wp-content/uploads/Agrisure-Viptera-MIR-162-Case-Study-An-Economic-

Impact-Analysis.pdf (emphasis added).

238.   Syngenta nevertheless moved forward with commercialization of Agrisure

Duracade™ for the 2014 planting season.

239.   On January 23, 2014, the National Grain and Feed Association and the National

American Export Grain Association issued another Joint Statement imploring Syngenta to stop its

heedless and irresponsible commercialization:

> On Jan. 22, 2014, the National Grain and Feed Association (NGFA)
> and North American Export Grain Association (NAEGA) sent a
> letter to Syngenta asking the company to immediately halt
> commercialization in the United States of its Agrisure Viptera®
> corn and Agrisure Duracade™ corn until such time as China and
> certain other U.S. export markets have granted required regulatory
> approvals/authorizations.

3668354.1

**Exhibit A**

The NGFA and NAEGA . . . are gravely concerned about the serious economic harm to exporters, grain handlers and, ultimately, agricultural producers – as well as the United States' reputation to meet its customers' needs – that has resulted from Syngenta's current approach to stewardship of Viptera. Further, the same concerns now transcend to Syngenta's intended product launch plans for Duracade, which risk repeating and extending the damage. Immediate action is required by Syngenta to halt such damage.

There are numerous negative consequences incurred when the Chinese and other U.S. export markets are put at risk through commercialization of biotechnology-enhanced seeds before approvals for import into foreign markets are obtained. Such consequences may include reducing the value and demand for the U.S. farmers' products, preventing foreign consumer access to much-needed supplies, shutting off or increasing the cost of U.S. producers' access to some export markets for their crops, exposing exporting companies to financial losses because of cargo rejections and contract cancellations, and ultimately diminishing the United States' reputation as a reliable, often-preferred supplier of grains, oilseeds and grain products in world markets. Commercialization prior to foreign regulatory approvals also has a negative impact on the overall U.S. corn and other grain value chains, and reduces significantly U.S. agriculture's contribution to global food security and economic growth.

Within the U.S. grain and oilseed handling and marketing system, each purchaser or handler makes its own determination as to whether to accept various commodity crops – including those produced from biotechnology-enhanced seeds. Such a decision likely is driven by customer preferences, infrastructure and operational limitations, regulatory regimes and contractual commitments, as well as meeting regulatory requirements in the respective markets they serve. Given the nature of the U.S. grain marketing system, these business decisions extend to the first point of sale or transfer from the producer.

As a matter of policy, NGFA and NAEGA have communicated consistently, clearly and in good faith with biotechnology providers and seed companies about the importance of biotechnology providers actually obtaining regulatory approvals/authorizations for import in foreign markets before such traits are commercialized in the United States. Individual grain handler, processor, service provider and exporter member companies of our Associations represent further system-wide support and advocacy for this policy.

61

> U.S. farmers, as well as the commercial grain handling and export industry, depend heavily upon the exercise of due corporate responsibility by biotechnology providers with respect to the timing of product launch and commercialization. We therefore seek assurances from Syngenta that it will follow suit by publicly announcing that it will suspend immediately its commercialization of Viptera and Duracade products in the United States until such time as China and other U.S. export markets have granted required regulatory approvals and authorizations.

http://www.ngfa.org/wp-content/uploads/NAEGA-NGFA-Joint-Public-Statement-on-Syngenta-Agrisure-Viptera-and-Duracade-Biotech-Traits-Jan-23-2014.pdf (emphasis added).

240.    Syngenta spokesman, Paul Minehart, responded by stating: "Changing our marketing plan in the U.S. now **would have no effect on grain in the system** or Chinese acceptance of corn imports."  Reuters, "U.S. Groups urge Syngenta to hold back on GM corn barred by China" (Jan. 23, 2014) (emphasis added).

241.    This pronouncement recognizes that indeed, MIR162 has contaminated the U.S. corn supply to an extent that it cannot be undone.  This is even more true given that Syngenta continues to market and sell Agrisure Duracade™ in addition to Agrisure Viptera®.

242.    In March 2014, in meetings with the NGFA, Syngenta advised that its introductory launch of Agrisure Duracade™ would likely extend to 250,000 to 300,000 acres in a launch zone which included portions of each of the ten (10) states which grow the largest amounts of corn.  In the same meetings, Syngenta refused to accept responsibility or liability if and when Agrisure Duracade™ becomes present in countries which had not approved it.   NGFA, Latest News, "Syngenta Provides Additional Details on Plans for 'Introductory launch' of Duracade, Biotech Corn in 2014" (March 7, 2014) http://www.ngfa.org/2014/2014/03/07/Syngenta-provides-additional-details-on-plans-for-introductory-launch-of-duracade-biotech-corn-in-2014/.

243.    In launching Duracade™, Syngenta stated that growers would be required to sign

a stewardship agreement requiring the grower to either feed the corn to livestock or poultry on the farm, or deliver it to a grain handling facility, feed mill, feed lot or ethanol plant not exporting corn or corn co-products to China or the European Union. *See* National Grain And Feed Association Newsletter Vol. 66, No. 5 dated March 7, 2014 at 2.

244.   The version of the stewardship agreement at launch, and referencing Duracade, did not do so. *See* Syngenta Seeds Inc. Stewardship Agreement (Rev. 6/05/2013). This version is, even now, the agreement Syngenta posts on its website. *See* http://www3.syngenta.com/country/us/en/agriculture/Stewardship/Documents/SyngentaStewardshipAgreement.pdf.

245.   Syngenta also did not require planting or harvesting protocols, but only made "recommendations" that the grower: (1) select fields for planting Duracade™ surrounded by the grower's own corn fields or planted next to a non-corn field; (2) place signs to notify others that Duracade™ was planted in the field; (3) plant buffer rows; (4) clean planters; (5) properly dispose of unused seed and return unopened seed units to the seed provider; (6) separately harvest Duracade™; (7) flush the combine; (8) deliver corn containing Duracade™ to a previously arranged delivery point; (9) store Duracade™ in a separate bin on the grower's farm; and (10) clean the bin floor.

246.   Syngenta officials stated that while Syngenta would apprise growers of such "recommendations," it "declined to incorporate the recommendations into the stewardship agreement because they did not want to dictate such practices to producers." National Grain And Feed Association Newsletter Vol. 66, No. 5 dated March 7, 2014 at 2.

247.   Syngenta was and is well aware that such measures are minimally necessary to an adequate stewardship program. Yet Syngenta did not require such measures in connection with

3668354.1

**Exhibit A**

either Agrisure Viptera® or Agrisure Duracade™.

248.    The NGFA issued a dire forecast of the damage Agrisure Duracade™'s premature

commercialization will cause:

> For the 2014 planting season, Syngenta has introduced another trait
> called Agrisure Duracade™ 5307 (hereafter referred to as 5307) that
> currently lacks Chinese import approval, potentially prolonging the
> U.S. loss of the large, growing Chinese feed grain import market. . .
> .

> China is roughly one year into its semi-regular, two-year process of
> evaluating the authorization of 5307 for import in food, feed and for
> further processing. Since Chinese authorization of 5307 is not
> expected for at least another year, China is expected to continue
> enforcing a zero-tolerance policy for unapproved biotech-enhanced
> traits in 2014/15, as occurred in marketing year 2013/14 for MIR
> 162. Thus, the commercialization in the United States of 5307 is
> expected to prolong the economic impact on U.S. corn and other
> commodities that began in mid-November 2013.

> Similarly to 2013/14, when the United States lost access to the
> Chinese corn import market, the 2014/15 market price impact
> caused by the presence of 5307 in U.S. commodity exports is
> expected to extend beyond the corn market and potentially affect
> other commodities, such as DDGS, soybean meal and soybeans,
> because of the substitutability of corn for these commodities in
> domestic feed rations. . . .

> [A]fter accounting for projected benefits and costs, the net economic
> impact of the 5307 commercial launch is estimated to result in a loss
> to the U.S. grain value chain ranging from $1.2 billion to $3.4
> billion, with a mid-point estimated net economic loss of $2.3 billion.

http://www.ngfa.org/wp-content/uploads/Agrisure-Duracade-5307-Economic-Impact-

Analysis.pdf (emphasis in original).

249.    In March 2014, Syngenta pulled Agrisure Duracade™ from the Canadian market

for the 2014 growing season because China and the European Union had not yet approved

MIR162.

**Exhibit A**

250. Syngenta said in a notice to Canadian growers: "While the vast majority of the Canadian corn crop is typically directed to domestic markets in North America, some corn may be destined for these markets." Reuters, "Syngenta halts sales of new GMO corn seed in Canada" (Mar 10, 2014). "Accordingly, we want to ensure the acceptance of any trait technology grown in Canada meets end-market destination requirements." *Id.*

251. As illustrated by the statements of its own representatives and this action, Syngenta knew that China was and is a key corn importer and that responsible management requires that its approval be obtained before commercialization of a bio-engineered corn trait.

252. As further illustrated, Syngenta knows how to withdraw an unapproved GM trait from the market when it wants to do so.

253. Nevertheless, Syngenta continued, and continues, to market and sell MIR162 corn in the United States.

254. Compounding its irresponsibility, Syngenta then decided to commercialize Agrisure Duracade™ in 2014, even though it contains MIR162, and *also* contains another genetic trait, Event 5307, not approved by China or other major purchasers of U.S. corn.

255. In September 2014, Syngenta announced 52 new corn hybrids for the 2015 growing season. MIR162 was in 23 new Agrisure Viptera® products and 18 new Agrisure Duracade™ products. *See* "Syngenta Announces 52 New Corn Hybrids for 2015 Season," Sept. 17, 2014 (http://www.agprofessional.com/news/Syngenta-announces-52-new-corn-hybrids-for-2015¬season-275494841.html)

256. In December 2014, China finally approved MIR162 for importation into China. By then, however, Syngenta already had begun commercializing yet another GMO corn seed product

**Exhibit A**

as discussed above. In addition, China's December 2014 approval is not likely to lessen the impact of Syngenta's conduct anytime soon.

257.    Syngenta affirmatively and purposefully engaged in all the actions and inactions described above in order to increase its own profits, ignoring the tremendous risks its profit-driven strategy imposed upon U.S. corn farmers and others.

258.    Syngenta knew, or should have known, prior to its commercialization of Agrisure Viptera® and at all times since then of the high likelihood that Agrisure Viptera®, would contaminate the U.S. corn supply and that channeling in the circumstance of its clearly inadequate "stewardship" program would not work.   As such, it was inevitable that Viptera® corn would move into export channels, including China, and cause trade disruption, as Syngenta well knew.

259.    Syngenta's acts and omissions have resulted in the pervasive contamination of the U.S. corn supply, including fields, grain elevators and other facilities of storage and transport, causing physical harm to Plaintiffs' corn, harvested corn, equipment, storage facilities, and land.

260.    The likelihood that Agrisure Viptera® -- and Duracade™ -- would (and will continue to) contaminate the U.S. corn supply was readily foreseeable to, and indeed foreseen by, Syngenta, as was the harm to corn farmers, who Syngenta describes as among its stakeholders "affected by" Syngenta's business.

261.    Syngenta had the right and ability to control the timing, size, and geographic scope of its commercialization of Agrisure Viptera® and Duracade™, as well as the extent to which adequate containment measures would be required of its customers.  Syngenta also could have instituted channeling measures but did not.  Syngenta also ignored repeated warnings from stakeholders and misrepresented and concealed material information, all to further its own profit.

66

**Exhibit A**

262.   Syngenta did not simply fail to take precautions against foreseen and at minimum, clearly foreseeable harm, but acted affirmatively to create it.

263.   Syngenta's conduct has directly caused and contributed to cause significant economic harm to farmers and other participants in the corn industry as explained below.

***Economic Impact***

264.   The characteristics of the world corn market have important implications for understanding the market price impact of the Chinese MIR162 ban on corn and corn products from the United States. Those include:

    a.    Corn is the most widely used feed grain in the world.

    b.    The United States is by far the largest producer and exporter of corn.

    c.    Prior to the import ban, virtually all of China's corn imports were from the United States.

    d.    Prior to the import ban, China was the third largest market for U.S. corn exports.

    e.    The latest U.S. Department of Agriculture (USDA) agricultural trade projections placed China as becoming the world's largest importer of corn by 2020.

    f.    The MIR162 import ban virtually halted U.S. corn sales to China indefinitely.

    g.    The world price of corn is established in Chicago and the loss of a key market for the U.S. puts downward pressure on the world price that reverberates to farmgate prices throughout the United States.

    h.    Corn is a commodity and a relatively small change in the global volume of trade in a commodity market like corn will have a magnified price impact.

    i.    An exporter's reputational loss in an agricultural commodity market due to an event like a GMO contamination can persist for many years. Once an exporter has lost a foreign market, it is difficult to get it back.

***Global Corn Market***

**Exhibit A**

265.    World corn production totaled 983.3 million metric tons (mmt) in 2013/14 (about 38.7 billion bushels). This supply was concentrated in a relatively small number of countries. The world's largest corn producers are the United States with about 36% of global production in 2013/14, China (about 22% of production), Brazil (8%), and the EU (7%).

266.    Global usage of corn has expanded by about 37% in the last decade, due to rising population and incomes, and increased urbanization with its associated changing dietary patterns. Feed usage accounts for about 58% of total global corn use, industrial use 27%, and food 11%. The pie chart below shows corn consumption by region.

**World Corn Consumption By Region**



Source:  International Grains Council

267.    At the end of each crop year, corn inventories are carried forward in case of a short harvest. The United States and China are the largest holders of corn inventories.  At the end of 2013/14, these two countries held 70% of the 176 mmt of global stocks.

268.    Total world corn trade is about 100 to 120 mmt per year. Prior to the MIR162 ban, China was importing about 4% of global corn sales.  That amount was projected by the USDA to

**Exhibit A**

increase substantially by 2020, when the USDA projects that China will be the world's largest

importer of corn at 16 million metric tons.



**China expected to become largest global corn importer**



Source: USDA Production, Supply and Distribution database and projections.

269.    The United States is the dominant exporter of corn. The big exporters include the

U.S. (36% of world trade), Brazil (20% of exports), the Ukraine (17%), and Argentina (10%).

These 4 countries alone account for over 82% of global exports.

**Table:  Major Corn Exporters: July 2013/ June 2014**

| Exporting Country | U.S. | Brazil | Ukraine | Argentina | Others | Total |
|---|---|---|---|---|---|---|
| Exports (million metric tons) | 42.8 | 23.5 | 19.9 | 12.0 | 21.8 | 120.0 |

69

**Exhibit A**

| Exports (million bushels) | 1,685 | 925 | 783 | 472 | 858 | 4,724 |
|---|---|---|---|---|---|---|

Source: International Grains Council

270.    Just over 10 years ago China was a significant exporter of corn (as well as all grains), with exports peaking at 15.2 million metric tons in 2002/03. China flipped from being a corn exporter to a corn importer in 2009/2010.



271.    As the chart below shows, China turned from a net exporter to a net importer of grains in 2008.  Imports of grains (including corn) surged during the 2012-13 time period, reaching 18 mmt.  Most of this grain originated from the United States.

70

**Exhibit A**

**China's net imports of grains surged during 2012-13**



Note: Net imports = imports − exports. Data for calendar years.
*DDGS= Distillers Dried Grains With Solubles.
Source: USDA, Economic Research Service analysis of China customs statistics.

272.    The import side of the international trade equation is more diverse, with the major importers including the EU, Japan, Mexico, South Korea, Chinese Taipei, China and Turkey (together accounting for 55% of imports in 2013/14). This leaves 45% of the corn imports destined for a large number of small importers.

**Major Corn Importers**



Source: International Grains Council.

71

**Exhibit A**

273.    In its annual long-term grain trade projections, released in February 2014, the U.S. Department of Agriculture projected that China's corn imports would grow from 2.7 mmt in 2012/13 to 22 mmt in 2023/24. China is by far the largest potential growth market for U.S. corn. These projections place China as the largest corn importer in the world by 2020.

*U.S. Corn Market*

274.    Corn is the largest crop in the United States, measured either by value of production or planted acres. In the 2013/14 September-August fiscal year, U.S. corn growers produced about 13.9 billion bushels of corn, worth more than $60 billion. Corn is used for livestock (primarily cattle, hogs, and chickens) feed (37% of 2013/14 crop), food, alcohol and industrial usage (46% of the 2013/14 crop) and exports (14% of the 2013/14 crop). U.S. Department of Agriculture, Economic Research Service, Feedgrains Yearbook, Table 4, http://www.ers.usda.gov/data-products/feed-grains-database.aspx#.VEJk-SiwRzo.

275.    Corn production in the United States is concentrated in the neighboring Midwestern states comprising the "corn belt," where soil and climatic conditions are highly conducive to growing corn.[1] About 95.4 million acres were planted in corn in the United States in the September-August 2013/14 marketing year.

276.    Corn prices throughout the United States are tied to the Chicago Board of Trade Futures (CBOT) price through the "basis" (defined as the futures price minus the local cash price). The U.S. corn market is spatially integrated and informationally efficient. Basis levels for spatially

---

[1] There are alternative definitions of exactly which states make up the "corn belt." The top ten producing states are Iowa, Illinois, Nebraska, Minnesota, Indiana, South Dakota, Wisconsin, Kansas, Ohio and Missouri.

72

separated markets are also closely linked. Events like trade disruptions that affect the CBOT corn prices directly affect the price that U.S. corn farmers receive for their corn.

### China's Corn Market

277.   China has emerged as a large player in the global market for agricultural products. As of 2012 it was the fourth largest exporter and second largest importer of agricultural products in the world, according to World Trade Organization trade statistics. Its import growth has been driven by a shift in its domestic production mix, and changing consumer diets with rising incomes and urbanization. The changing diets have especially driven strong demand growth for meat (mainly pork and chicken), which requires a large supply of feed grains including corn and distillers' dried grains with solubles (DDGS), a byproduct of corn ethanol production, and soybeans.

278.   China is the now largest foreign market for U.S. agricultural products. The U.S. Department of Agriculture (USDA, Outlook for U.S. Agricultural Trade, AES-83, August 28, 2014) reports that U.S. agricultural exports to China have almost doubled in the last five years, totaling $28 billion in fiscal Oct. 2013-Sept. 2014.

279.   Prior to the U.S. corn import ban, the top three U.S. agricultural exports to China (in order of importance) were soybeans, cotton, and corn, based on value of trade. In November 2013, China started turning back cargoes containing Syngenta's MIR162 biotech corn. While MIR162 is now approved, Event 5307 is not.

280.   U.S. corn exports to China reached 5.146 mmt in 2011/12 (approximately 13% of U.S. exports that Sep-Aug marketing year) and were 2.39 mmt in 2012/13–still about 13% of exports (lower export volume due to the big U.S. drought). By contrast, due to the China import ban of U.S. corn beginning in November 2013, the absolute volume of U.S. corn exports to China

**Exhibit A**

in 2013/14 was not much higher than the drought year, and fell to less than 6% of exports. If the current trend that began after November 2013 continues, U.S. corn exports to China in 2014/15 and beyond will be negligible.

281.   The following graph shows the dramatic difference in accumulated U.S. exports to China after the MIR162 ban, taking into account seasonal variations in export quantities.



Accumulated Exports - CHINA, PEOPLES REPUBLIC OF
Corn
Selected Year: 2014-2015 as of 05/07/2015

5/15/2015 Source: USDA/FAS/Export Sales Reporting

282.   If access to the China market continues to be denied to U.S. corn imports, the losses will be even more significant and will continue to grow. As the following quote explains, China was expected to be a very rapidly growing import market for corn.

> "China's corn imports are projected to rise steadily and reach 22 million tons by 2023/24. China's strengthening domestic demand for corn is driven by structural change and growth in its livestock sectors, as well as by rising industrial use. The increase in China's imports accounts for nearly half of the projected growth in world corn trade." USDA Long-Term Projections Feb. 2014, p. 20.

USDA Agricultural Projections to 2023, www.usda.gov/oce/commodity/projections/.

**Exhibit A**

283.    For fiscal year 2013/2014 China was expected to import 7 mmt of corn and 6 mmt in 2014/15. Since the news of the rejected cargoes surfaced, U.S. Department of Agriculture analysts have lowered projections of China's total annual imports from 7 to 3.5 mmt in 2013/14 and from 6 to 3 mmt for 2014/15. These projections obviously reflect the assumption that U.S. corn trade with China will begin again sometime in 2014/15. If that does not occur, the actual imports will be far lower than the projected imports. The damage to the U.S. corn market and the prices U.S. corn farmers receive for their corn likely will be long lasting. *See* Paragraph 285 below.

284.    To make up for reduced imports from the U.S., China has increased imports from the Ukraine and there are reportedly small shipments from Brazil and Argentina. In other words, the U.S. is already beginning to lose China as an important corn export market. If the import ban continues, it will be increasingly difficult to get it back.

*GMOs in China*

285.    China imports more biotech soybeans than any other country. This marketing year China is expected to import 72 mmt of soybeans. The vast majority of China's soybean imports are biotech varieties, even though biotech soybeans (and corn) are not commercially grown in China. China imports soybeans primarily from the United States, Brazil and Argentina.

286.    China has approved five biotech crops for importation – canola, cotton, corn, soybeans, and sugar beets. Approximately 15 different corn biotech products have been approved by China, including "events" developed by Monsanto, Syngenta, Bayer, and Du Pont. The number of approved soybean products is approximately 8 and there are 6 cotton and 7 canola products. Only 1 sugar beet product has been approved.

**Exhibit A**

287.   China started testing and rejecting cargoes of U.S. corn in November 2013 and subsequently began rejecting U.S. distiller's dried grains with solubles (DDGS)–a corn ethanol by-product–imports in June or July 2014.

288.   By mid-December 2013, China had rejected shipments of U.S. corn totaling 545,000 metric tons. *See* http://www.reuters.com/article/2013/12/20/china-corn-idUSL3N0JZ0EZ20131220. China also rejected 2,000 metric tons of U.S. distiller's dried grains with solubles (DDGS), a corn ethanol by-product, imports in December 2013, and continued rejecting DDGS through 2014. *See* http://ngfa.org/wp-content/uploads/Agrisure-Viptera-MIR-162-Case-Study-An-Economic-Impact-Analysis.pdf.

289.   Beginning in July 2014, China's General Administration of Quality Supervision, Inspection and Quarantine announced that it would require official government certification from the point of origin that shipments DDGS are free of MIR162. DDGS are used in livestock feed rations primarily as an energy source. China's rejection of U.S. DDGS due to the presence of MIR162 has important – and negative – implications on the price of U.S. corn.

***DDGS Trade***

290.   U.S. DDGS exports to China totaled 2.16 mmt in calendar year 2012 and 4.45 mmt in calendar year 2013. DDGS trade has been hit hard recently, but the extent of the impact on corn prices may not show up in the trade data yet.

76

**Exhibit A**

**U.S. Exports of Corn and DDGS to China: 2009-2013 (calendar years)**



Source: USDA, GATS. DDG HS code 2303300000

291.    China was by far the largest market for U.S. DDGS exports, accounting for approximately 50% of all exports. The U.S. exports over 20% of annual DDGS production. http://www.extension.iastate.edu/agdm/crops/outlook/dgsbalancesheet.pdf.

292.    The loss of the large Chinese market for DDGS displaces corn in the U.S. domestic market, pushing corn prices down further.

293.    DDGS are an important source of revenue for US ethanol plants. Lower DDGS prices due to the loss of the Chinese market have negatively affected ethanol crush margins. The corn crush spread is a dollar value quoted as the difference between the combined sales values of the products (ethanol and DDGS) and the cost of corn. China's ban has lowered DDGS prices and therefore lowered the DDGS value per bushel of corn processed by the ethanol producers. This may be partially offset by a lower price of corn due to the ban. However, USDA (USDA, AMS, Bioenergy Market News Reports) figures on ethanol crush margins indicate the difference between corn price and value of co-products was $3.67 per bushel on May 2, 2014 and then fell to $2.28 per bushel on September 26, 2014. The value of DDGS per bushel of corn processed into ethanol

77

was $2.08 on May 2nd this year, compared to only $1.02 on September 26, 2014. About 4.7 billion bushels of corn are used for ethanol annually, so the financial loss to the ethanol industry from the MIR162 ban is significant.

294.    The impact of the loss of the Chinese market for corn and corn products to U.S. corn farmers likely will be long lasting. The MIR162 incident has similarities to other international GM contamination incidents, which have had long-lasting market effects. For instance, 8 years after the 2006 Bayer Crop Science's Liberty Link contamination of the U.S. long-grain rice supply, exports to Europe have yet to recover. Prior to the 2006 marketing year the EU-27 procured approximately 25% of its rice imports from the United States. Immediately after the contamination event, the EU blocked imports of any new commercial U.S. long-grain rice imports. In fact U.S. long grain rice farmers lost one of their most important markets and they have yet to get it back despite considerable effort and expense. Recently, an official delegation from the U.S. rice industry visited countries in the EU (such as Germany and the United Kingdom) where they held discussions focused on the re-introduction of U.S. rice into this important market. After this visit, the USA Rice Federation reported that market re-entry faces significant hurdles:

> "The U.S. has a superior product and the industry has successfully addressed environmental and social concerns of this market, but it's clear we have more work to do before our German customers return to us," said Keith Glover, president and CEO of Producers Rice Mill and chairman of USA Rice's World Market Price committee." USA Rice Federation, *USA Rice Daily*, Tuesday October 14, 2014.

295.    In commodity markets like corn, a relatively small change in trade volume can have a significant impact on price. One of the prime examples of the operation of this basic law of economics occurred in 1973 when Middle Eastern Arab oil producers (Iran and Arab members of OPEC) cut off exports to the U.S. to protest American military support for Israel. Even though imports from this region accounted for only about 10% of the U.S. oil supply, petroleum prices

78

quadrupled in response to the export embargo and there were long lines for gasoline at filling stations.

296.    Another more recent example of inelastic demand at work is evident from the world coffee market. Brazil produces about 35% of the world's coffee and is unfortunately in the middle of a drought that is affecting both the 2014 and 2015 coffee harvests in that country. In 2014 the Brazilian coffee harvest was down about 13% and this doubled the price of coffee. World coffee production is about 150 million bags per year and as the following quote from the *Financial Times* indicates, a 10 million bag swing in Brazil's production over a two year period (about a 3.5% change in production) can mean the difference in coffee prices ranging between $3 and $1.50 per pound.

> "Brazil is the largest coffee producer in the world, accounting for about 35 per cent of all output. Industry consensus around the 2014 Brazilian harvest seems to have settled at about 48m 60kg bags, down from the previous year's 54-55m, but the 2015 forecasts have ranged widely between 40m and 53m bags. Estimates for the cumulative Brazil supply 2014 and 2015 combined, range from 92m to 102m bags, which is the difference between $3.00 and $1.50 per pound of coffee." *Financial Times*, Wednesday, Sep 17, 2014.

297.    Based on the same economic logic, the *Wall Street Journal* reasoned that the loss of the Chinese corn market to the U.S. industry over MIR162 will have an important impact on the U.S. corn price even though that market represented only about 12% of U.S. exports.

> "Exports account for only about 12% of the U.S. corn crop, but China's rapid growth gives the country an outsize influence over prices." *Wall Street Journal*, April 11, 2014, U.S. Corn Exports to China Dry Up Over GMO Concerns.

298.    In the U.S. corn market, both domestic demand and supply curves are relatively inelastic, especially in the short run. Elasticity measures the degree of responsiveness in supply or demand to price changes. If both the supply and demand curves are inelastic, then for each curve

**Exhibit A**

it will take a relatively large change in price to effect a change in quantity demanded or supplied. This is shown in the left panel of the diagram below where the U.S. domestic demand for corn is represented as schedule $US_D$ and the domestic supply is labeled as $US_S$. Both of these curves are inelastic as drawn. The horizontal difference between the supply ($US_S$) and demand ($US_D$) at world price ($P_{US}$) is the amount of corn exported.

299.   The right hand panel of the diagram shows the market for U.S. corn exports. The U.S. export supply curve shown to the world market is labeled as $US_{ES}$. This curve is based on the U.S. domestic supply and demand curves in the left hand panel. For any price above the point where $US_D$ and $US_S$ intersect in the left hand panel there is excess domestic corn that is supplied to the world market according to the schedule $US_{ES}$ in the right hand panel. The world demand for U.S. corn is shown by the curve $ROW_{ED}$ in the right hand panel. This includes demand from China. Following the MIR162 ban the $ROW_{ED}$ curve shifts left as shown by the arrows in the right hand panel. An inward shift of the global demand for U.S. corn reduces exports from the U.S. The intersection of the shrunken $ROW_{ED}$ curve and $US_S$ determines the volume of trade after the MIR162 ban. U.S. corn exports are reduced by a fixed volume due to a foreign market closing, and the U.S. price falls to $P'_{US}$. The drop in price is relatively large even if the shrinkage in exports is a small share of production, because the price must fall to clear a market in which both supply and demand are inelastic.

**Exhibit A**



300.    Under the bedrock economic law of supply and demand, for an exportable good, when there is less foreign demand for a product, particularly one with a relatively inelastic demand and supply curves, the price is lower than it otherwise would be.

301.    As a result, all U.S. corn farmers who priced their corn after November 2013 have received a lower price for their corn than they would have received if China's imports of U.S. corn had not effectively stopped.

## CLASS ACTION ALLEGATIONS

302.    Plaintiffs bring this action pursuant to pursuant to S.D.C.L. §§ 15-6-23 23(a), 23(b)(1), and 23(b)(3) ("Rules" or, individually, "Rule"), on behalf of Plaintiffs and a number of classes (each a "Class," and collectively, "the Classes"), consisting of all persons and entities in South Dakota (defined below) and, collectively, in a Nationwide Corn Producers Class (defined

3668354.1

**Exhibit A**

below), who, during the relevant time period, were corn producers[2] that priced their corn for sale after November 18, 2013.

303.    The "Nationwide Corn Producers Class" consists of all corn producers in the United States that grew and harvested corn and then sold the corn on a commercial basis (or who received revenue from such corn under a crop-share agreement) after November 18, 2013. Excluded from the Nationwide Corn Producers Class are the Court and its officers, employees, and relatives; Defendants and their subsidiaries, officers, directors, employees, contractors, and agents; and governmental entities. Plaintiffs reserve the right to amend the class definition prior to class certification.

304.    Plaintiffs, in the manner(s) described in Counts I-II below, asserts claims on behalf of themselves and the Nationwide Corn Producer Class as well as the South Dakota State Corn Producers Class, for Defendants' violations of the Lanham Act and the Minnesota consumer protection and trade practices acts.

305.    In addition or alternatively, Plaintiffs, in the manner(s) described in Counts III-IV below assert claims against all Defendants, individually and on behalf of the South Dakota State Corn Producers Class for Defendants' violations of South Dakota state law.

306.    The "South Dakota State Corn Producers Class" consists of all residents of South Dakota that grew and harvested corn in South Dakota and then sold the corn on a commercial basis (or who received revenue from such corn under a crop-share agreement) after November 18, 2013. Excluded from the South Dakota State Corn Producers Class are the Court and its officers,

---

[2] "Producer" is defined as an owner, operator, landlord, waterlord, tenant, or sharecropper, who shares in the risk of producing corn and who is entitled to share in the corn crop available for marketing from the farm, as reflected in FSA Form 578. A landlord who receives only a fixed cash amount for renting the land that does not vary with the size of, or pricing for, the crop is not a Producer.

**Exhibit A**

employees, and relatives; Defendants and their subsidiaries, officers, directors, employees, contractors, and agents; and governmental entities. Plaintiffs reserves the right to amend the class definition prior to class certification.

307.     The requirements of 23(a) are satisfied for each of the foregoing Classes because the members of each Class are so numerous and geographically dispersed that joinder of all its members is inapplicable.  With regard to the Nationwide Corn Producers Class, over 83 million acres of corn were planted and harvested for grain in the United States in 2014.  The number of acres of corn planted and harvested for grain in 2014 in South Dakota is approximately 5,320,000 acres. Although the exact number and identity of each Class member is not known, there are hundreds, if not thousands, of members in the Nationwide and South Dakota State Corn Producers Class. The "numerosity" requirement of 23(a)(1) is, therefore, satisfied.

308.     The "commonality" requirement of 23(a)(2) is satisfied because there are questions of law and fact common to Plaintiffs and the other members of each of the Classes.  Among those common questions of law and fact are:

a.     whether the members of the Nationwide and South Dakota State Corn Producers Class have sustained or continue to sustain damages in their business or property by reason of Defendants' violation of the Lanham Act and Minnesota law, and, if so, the proper measure and appropriate formula to be applied in determining such damages;

b.     whether Defendants, through their acts or omissions, caused or contributed to cause the loss of export markets for U.S. corn, including China;

c.     whether Defendants knew or should have known that their acts or omissions would cause or contribute to cause the loss of export markets, including China;

d.     whether the loss of export markets for U.S. corn, including China, resulted in a reduction in the price producers received for U.S. corn;

83

3668354.1

**Exhibit A**

e.     whether Defendants are legally responsible for the loss of export markets and reduction in the price producers received for U.S. corn under one or more of the legal theories asserted in this complaint;

f.     whether the members of the Nationwide Corn Producers Class and/or the South Dakota State Corn Producer Class have sustained and continue to sustain damage as a result of Defendants' wrongful conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages for the Nationwide Corn Producers Class and/or the South Dakota State Corn Producer Class; and

g.     whether the members of the Classes are entitled to compensatory, statutory, exemplary, and/or punitive damages.

309.     Plaintiffs' claims are typical of the claims of all other members of each of the respective Classes that they seek to represent, as described above, because they arise from the same course of conduct by Defendants and are based on the same legal theories as do the claims of all other members of each of the respective Classes. Moreover, Plaintiffs seek the same forms of relief for themselves as they do on behalf of absent Class members. Accordingly, Plaintiffs have satisfied the "typicality" requirements of 23(a)(3) with respect to each of the Classes Plaintiffs seek to represent.

310.     Because Plaintiffs' claims are typical of the respective Classes that Plaintiffs seek to represent, Plaintiffs have every incentive to pursue those claims vigorously. Plaintiffs have no conflicts with, or interests antagonistic to, the corn producers comprising the other members of the Classes Plaintiffs seek to represent relating to the claims set forth herein. Also, Plaintiffs' commitment to the vigorous prosecution of this action is reflected in Plaintiffs' retention of competent counsel experienced in litigation of this nature to represent Plaintiffs and the other members of each of the Classes. Plaintiffs' counsel will fairly and adequately represent the interests of each of the proposed Classes, and: (a) have identified and thoroughly investigated the claims set forth herein; (b) are highly experienced in the management and litigation of class actions

84

**Exhibit A**

and complex litigation; (c) have extensive knowledge of the applicable law; and (d) possess the resources to commit to the vigorous prosecution of this action on behalf of the proposed Classes. Accordingly, Plaintiffs satisfy the adequacy of representation requirements of Rule 23(a)(4) with respect to each of the proposed Classes.

311.    In addition, this action meets the requirements of Rule 23(b)(1).  This case raises questions about, among other things, Syngenta's duty of care with respect to its commercialization of genetically modified traits, which necessarily require class wide adjudication to prevent the risk of inconsistent rulings and incompatible standards of conduct for Defendants.  Moreover, absent a representative class action, many members of the proposed Classes would continue to suffer the harms described herein, for which they would have no remedy.  Even if separate actions could be brought by individual corn producers, the resulting multiplicity of lawsuits would cause undue hardship and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated corn producers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendants.

312.    This action additionally meets the requirements of Rule 23(b)(3).  Common questions of law and fact, including those enumerated above, exist as to the claims of all members of each of the respective Classes and predominate over questions affecting only individual Class members of each such Class, and a class action is the superior method for the fair and efficient adjudication of this controversy.  Class treatment will permit large numbers of similarly-situated persons to prosecute their respective class claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce.  Furthermore, while damages to members of each of the proposed Classes

85

**Exhibit A**

are substantial in the aggregate, the damages to any individual member of the proposed Classes may be insufficient to justify individually controlling the prosecution of separate actions against Defendants.

313.    This case is manageable as a class action, and a class trial will be manageable. Notice may be provided to members of the respective Classes by first-class mail and through alternative means of publication and the Internet. Moreover, the Nationwide Corn Producers Class members' claims will be decided under federal substantive law and the substantive law of only one state (Minnesota), and the South Dakota State Corn Producers Class' claims will likewise each be decided under the substantive law of only South Dakota. Thus, the Court will not have to grapple with the application of multiple jurisdictions' law to the members of any single Class.

314.    To the extent not all issues or claims, including damages, can be resolved on a class-wide basis, Plaintiffs invoke Rule 23(c)(4) and reserve the right to seek certification of narrower and/or re-defined Classes and/or to seek certification of a liability class or certification of certain issues common to the class.

### CLAIMS FOR RELIEF

#### Count I - Lanham Act
#### (On Behalf of the Nationwide Corn Producers Class and
#### South Dakota State Corn Producer Class)

315.    The Nationwide Corn Producers Class and South Dakota State Corn Producer Class incorporates by reference Paragraphs 1-314 as though fully alleged herein.

316.    The Lanham Act, 15 U.S.C. § 1125(a), entitled "False designation of origin, false descriptions, and dilution forbidden," provides in pertinent part:

        a.    Civil action

        (1)    Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device,

**Exhibit A**

or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

> (A)    is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> (B)    in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

317.    Syngenta used and/or continues to use in commerce false or misleading descriptions of fact, and/or false or misleading representations of fact, which misrepresented, and were likely to cause and/or did cause confusion and mistake or to deceive, regarding MIR162, the timing of its approval by China, its impact on export markets for U.S. corn, including China, the ability to channel MIR162 away from export markets which have not approved MIR162, and corn prices.

318.    Syngenta's representations, statements, and commentary have included:

a.    To APHIS and the public, including stakeholders interested in the MIR162 Deregulation Petition, that deregulation of MIR162 should not cause an adverse impact upon export markets for U.S. corn, that Syngenta would communicate the stewardship requirements "using a wide ranging grower education program," and that at the time the MIR162 Deregulation Petition was submitted to APHIS, regulatory filings were in progress in China;

b.    To APHIS and the public that MIR162 could and would be channeled away from markets which had not yet approved MIR162;

c.    To the press and to investment analysts on quarterly conference calls;

d.    Through statements in marketing materials published on the Internet such as its "Plant With Confidence" fact sheet; and

e.    Through other statements indicating that approval from China for MIR162 corn was expected at times when Syngenta knew it was not.

**Exhibit A**

each as more fully alleged above, are materially false statements that misrepresented, and are, and continue to be, likely to cause confusion and mistake as to the nature, characteristics, and qualities of MIR162 corn, the timing of its approval by China, the impact of MIR162 corn on the export markets, including China, for U.S. corn, the ability to channel MIR162 away from export markets which have not approved MIR162, and corn prices.

319.    Syngenta's misleading representations of fact relating to the U.S. corn export market, and particularly in relation to China's position as a major export market, also misrepresented to, and deceived and/or continue to deceive, farmers and other consumers. Syngenta's "Plant With Confidence" fact sheet has, and misrepresented, and is likely to continue, to cause confusion and mistake as to the percentage of U.S. corn exported to China on an annual basis, among other facts.

320.    Syngenta's misleading representations of fact also include the statements in the MIR162 Deregulation Petition as more fully set forth above, including in Paragraphs 64-69.

321.    Additionally, Syngenta's representations misrepresented, and deceived and/or continue to deceive, farmers, other consumers and stakeholders as to the status of approval for distribution of MIR162 corn in China, a major export market.

322.    Syngenta's MIR162 corn products were misrepresented, and caused, and/or were likely to cause, customer confusion regarding the approval of the products from foreign regulatory authorities, including the Chinese government.

323.    . Syngenta's statements were made in commercial advertising or promotion for MIR162 corn products, including Viptera® and Duracade™.

324.    Syngenta had an economic motivation for making its statements, as Syngenta was incentivized to sell its MIR162 corn products.

**Exhibit A**

325. Syngenta's statements were likely to influence purchasing decisions by domestic corn producers.

326. Syngenta's statements were widely distributed, which is, at least, sufficient to constitute promotion within the grain industry.

327. Thus, Syngenta's misleading representations and statements are and/or were material.

328. Syngenta's products travel or traveled in interstate commerce.

329. Plaintiffs and the other Nationwide Corn Producer Class and South Dakota State Corn Producers Class members have and continue to be damaged by Syngenta's material misrepresentations. Plaintiffs and the other Nationwide Corn Producer Class and South Dakota State Corn Producers Class members were injured and/or continue to suffer injury to, among other things, their property and possessory rights in the corn they have grown, as well as the negative market price impact explained above, which results in lower revenues and profits. Those economic injuries are likely to continue in the future.

330. Plaintiffs and the other Class members' damages were proximately caused by Syngenta's misleading representations as described herein.

331. Syngenta's representations, statements and commentary as more fully set forth herein were made with knowledge or reckless disregard of their falsity and the resulting risk and damage to Plaintiffs, other corn producers, and stakeholders.

332. Syngenta's acts constitute the use of false descriptions and false representations in interstate commerce in violation of § 43(a) of the Lanham Act and entitle Plaintiffs, individually and on behalf of the other Class members, to recover damages, the costs of this action, and, because this case is exceptional, reasonable attorneys' fees.

**Exhibit A**

**Count II - Violation of Minn. Stat. §§ 325D.13 and 325F.69
(On Behalf of the Nationwide State Corn Producers Class and
South Dakota State Corn Producer Class)**

333.    Plaintiffs incorporate by reference Paragraphs 1-332 as though fully alleged herein.

334.    Syngenta made false or misleading statements regarding MIR162 and its impact on
export markets for U.S. corn, including China, and corn prices.

335.    Syngenta's representations, statements and commentary have been largely
disseminated, and included:

> a.    To APHIS and the public, including stakeholders interested in the MIR162
> Deregulation Petition that deregulation of MIR162 should not cause an
> adverse impact upon export markets for U.S. corn that Syngenta would
> communicate the stewardship requirements "using a wide ranging grower
> education program," and that at the time the MIR162 Deregulation
> Petition was submitted to APHIS, regulatory filings were in progress in
> China.
>
> b.    To APHIS and the public that MIR162 could and would be channeled
> away from markets which had not yet approved MIR162.
>
> c.    To the press and to investment analysts on quarterly conference calls.
>
> d.    Through statements in marketing materials published on the Internet such
> as its "Plant With Confidence" fact sheet.
>
> e.    Through other statements indicating that approval from China for MIR162
> corn was expected at times when Syngenta knew it was not.

336.    In addition, Syngenta stated in 2007 that its regulatory filings with China were "in
process" when it did not actually file for approval from China until 2010.

337.    Syngenta made numerous misrepresentations pertaining to the status of China's
import approval for MIR162. Among others, and as more fully set forth above, Syngenta during
the summer of 2011, represented to stakeholders, including growers (to encourage further sales,
planting and harvesting of MIR162), that it would receive China's approval in March 2012.
Syngenta continued making this misrepresentation throughout the planting and harvesting season

**Exhibit A**

in 2011 and into 2012. On April 18, 2012, Syngenta's Chief Executive Officer, Michael Mack, stated that he expected China to approve Agrisure Viptera® "quite frankly within the matter of a couple of days." Based upon Syngenta's knowledge of the Chinese regulatory process, and its own status within that process for MIR162, Syngenta knew this representation was false and/or made this representation recklessly and willfully without regard to its consequences.

338. In addition to these false and misleading statements, Syngenta failed to disclose, and actively suppressed and concealed, that approval from China was not expected or reasonably likely to occur for (at least) the 2011 or 2012 growing seasons and that purchase and planting of Viptera® created a substantial risk of loss of the Chinese market.

339. Syngenta also has at all times made false and misleading statements regarding the ability to channel MIR162 corn, as well as the state and effectiveness of its supposed stewardship generally and in regard to MIR162.

340. Syngenta also failed to disclose, and actively suppressed and concealed, that there was not (and would not be) an effective system in place for isolation or channeling of Agrisure Viptera® or Duracade™.

341. As a developer of genetically modified products (including MIR162), Syngenta has special knowledge of regulatory matters and facts pertaining to the content and status of its application for foreign approvals to which corn farmers, including Plaintiffs, do not have access.

342. Syngenta also has special knowledge regarding the systems it did and did not institute for isolation and channeling of its genetically modified products, including Agrisure Viptera® and Duracade™, which was not available to corn farmers, including Plaintiffs.

343. Syngenta knew but failed to disclose, suppressed and concealed that systems were not in place for either isolation or effective channeling of Agrisure Viptera® and Duracade™ and

**Exhibit A**

that absent robust isolation practices and effective channeling, it was virtually certain that Agrisure Viptera® or Duracade™ would disseminate throughout the U.S. corn supply and into export markets, including China, which had not approved import, causing market disruption.

344.     Syngenta also knew but failed to disclose, suppressed and concealed, at minimum, in 2010-2011 that it would not have import approval from China by the 2011 crop year and in 2011-2012 that it would not have import approval from China by the 2012 crop year, and failed to disclose that China was a significant and growing import market. Syngenta further failed to disclose at all relevant times the insufficiency of its approval request to China, and that it sought approval cultivate MIR162 in China, both of which Syngenta knew would cause delay in China's approval process for MIR162. Syngenta also failed to disclose, and suppressed and concealed, that there was not (and would not be) an effective system in place for isolation or channeling of Agrisure Viptera® or Duracade™ and the very high likelihood that MIR162 would move into export channels where it was not approved, causing market disruption.

345.     Syngenta engaged in these deceptions in order to sell and increase its sales of Viptera® and Duracade™, despite Syngenta's further knowledge that the more acres grown with them, the more likely it would be that Agrisure Viptera® and Duracade™ would disseminate into the U.S. corn supply and farmers would be harmed.

346.     Syngenta knew that farmers like Plaintiffs here are affected by its business and depend on it for responsible commercialization practices.

347.     For all these reasons, Syngenta had a duty to disclose the truth – that import approval from China (a key market) was not imminent or indeed anticipated for (at least) the 2011 and 2012 growing seasons, that there was not an effective system in place to channel Agrisure Viptera® and Duracade™ away from China (or other foreign markets) from which Syngenta did

92

not have approval, and that purchase and planting of Viptera® (and later Duracade™) created a substantial risk of loss of the Chinese market and/or prolonging the loss of that market.

348.    In addition, Syngenta made numerous misrepresentations to the effect that approval from China was on track and/or would be received during time periods when Syngenta knew it would not, and that Agrisure Viptera® and Duracade™ could, and would, be channeled away from markets for which approval had not been obtained.   Syngenta had a duty to prevent words communicated from misleading others.

349.    Syngenta's misrepresentations and omissions were made intentionally or recklessly.

350.    Syngenta, in connection with the sale of merchandise – Viptera® and Duracade™ -- knowingly misrepresented, directly or indirectly, the true quality of that merchandise in violation of Minn. Stat. § 325D.13.

351.    Syngenta used or employed fraud, false pretense, false promise, misrepresentation, misleading statements or deceptive practices, with the intent that others rely thereon in connection with the sale of Agrisure Viptera® and Duracade™, in violation of Minn. Stat. § 325F.69.

352.    Syngenta's violations of Sections 325D.13 and 325F.69 proximately caused harm to Plaintiffs and other members of the Nationwide and the South Dakota State Corn Producers Class.

353.    This action will serve a public benefit.  Not only were Syngenta's misrepresentations made to a large segment of the public, Syngenta's conduct vitally affects a large segment of the public as well – all farmers and others in the business of selling corn and corn products – who depend on the responsible stewardship practices of developers like Syngenta when commercializing GM products.  The issues surrounding what duties and liabilities such developers

93

**Exhibit A**

have for irresponsible and intentional acts is not limited to corn but impact all developers and stakeholders in similar position.

354. Plaintiffs and the other members of the Nationwide and South Dakota State Corn Producers Class are entitled to compensatory damages and attorneys' fees (see Minn. Stat. § 8.31, subd. 3a).

## Count III - Negligence
### (On Behalf of the South Dakota State Corn Producers Class)

355. Plaintiffs incorporate by reference Paragraphs 1-354 as though fully alleged herein.

356. Syngenta owed a duty of at least reasonable care to its stakeholders, including Plaintiffs and members of the South Dakota State Corn Producers Class in the timing, scope, and terms under which it commercialized MIR162.

357. Syngenta breached its duty by acts and omissions including but not limited to:

    a.   Prematurely commercializing Agrisure Viptera® and Duracade™ on a widespread basis without reasonable or adequate safeguards;

    b.   Instituting a careless and ineffective "stewardship" program;

    c.   Failing to enforce or effectively monitor its stewardship program;

    d.   Selling Agrisure Viptera® and/or Duracade™ to thousands of corn farmers with knowledge that they lacked the mechanisms, experience, ability and /or competence to effectively isolate or "channel" those products;

    e.   Failing to adequately warn and instruct farmers on the dangers of contamination by MIR162 and at least the substantial risks that growing Viptera would lead to loss of the Chinese market;

    f.   Distributing misleading information about the importance of the Chinese market; and

    g.   Distributing misleading information regarding the timing of China's approval of Agrisure Viptera® and/or Duracade™.

94

**Exhibit A**

358.     Syngenta's negligence proximately caused damages to Plaintiffs and other members of the South Dakota State Corn Producers Class.

359.     Plaintiffs and other members of the South Dakota State Corn Producers Class are thus entitled to an award of compensatory damages and prejudgment and post-judgment interest.

360.     Syngenta's conduct was willful and wanton and indicated a reckless disregard for the rights of the Plaintiffs and the other members of the South Dakota State Corn Producers Class. Punitive damages are thus warranted.

## Count IV - Trespass to Chattels
### (On Behalf of the South Dakota State Corn Producers Class)

361.     Plaintiffs incorporate by reference Paragraphs 1-360 as though fully alleged herein.

362.     By commercializing Agrisure Viptera® and/or Duracade™ prematurely and without adequate systems to isolate and channel it, Syngenta intentionally intermeddled with and brought Agrisure Viptera® and/or Duracade™ into contact with non-Agrisure Viptera/Duracade corn in which Plaintiffs and other members of the South Dakota State Corn Producers Class had possession and/or possessory rights.

363.     Syngenta knew that its conduct would, to a substantial certainty, bring Agrisure Viptera® and/or Duracade™ into contact with Plaintiffs' and other members of the South Dakota State Corn Producers Class' corn through contamination in fields and/or in grain elevators and other modes of storage and transport.

364.     As a result of the trespass, the Plaintiffs' and other members of the South Dakota State Corn Producers Class' chattels were impaired as to condition, quality or value, and Plaintiffs and other members of the South Dakota State Corn Producers Class were damaged.

365.     Plaintiffs and the other members of the South Dakota State Corn Producers Class are thus entitled to an award of compensatory damages, prejudgment and post-judgment interest.

95

**Exhibit A**

366.    Syngenta's conduct was willful and wanton and indicated a reckless disregard for the rights of the South Dakota Plaintiffs and the other members of the South Dakota State Corn Producers Class.  Punitive damages are thus warranted.

## DEMAND FOR JUDGMENT

Plaintiffs, on behalf of Plaintiffs and the respective Classes, demand judgment from Defendants for:

(a)    All monetary and compensatory relief to which they are entitled and will be entitled at the time of trial;

(b)    Punitive damages;

(c)    Attorneys' fees;

(d)    Prejudgment interest and post-judgment interest at the maximum rates allowed by law;

(e)    The costs of this action; and

(f)    Such other and further relief as is appropriate.

Dated this 17th day of November, 2016

Respectfully submitted,

/s/ Michael T. Andrews
Michael T. Andrews (SD #3158)
ANDERSON, BOTTRELL,
SANDEN & THOMPSON
4132 30th Ave. South, Suite 100
Fargo, North Dakota 58104
(701) 235-3300
mandrews@andersonbottrell.com

96

3668354.1

**Exhibit A**

THE FOLLOWING DEFENDANTS WILL BE SERVED IN ACCORDANCE WITH APPLICABLE LAW:

Syngenta AG
Appellationsgericht
Basal-Stat, Baumleingasse1
4051 Basel
Switzerland

Syngenta Crop Protection AG
Appellationsgericht
Basal-Stat, Baumleingasse1
4051 Basel
Switzerland

Syngenta Corp.
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

Syngenta Crop Protection, LLC
C T Corporation System
319 Coteau Street
Pierre, South Dakota 57501-3108

Syngenta Seeds, LLC ·
C T Corporation System
319 Coteau Street
Pierre, South Dakota 57501-3108

97

**Exhibit A**